BITZER CROFT MOTORS, INC., Plaintiff-Appellant, *v.* PIONEER BANK & TRUST COMPANY, Defendant and Third-Party Plaintiff-Appellee.— (MICHAEL A. TATALOVICH *et al.*, Third-Party Defendants.)

Fifth District   No. 79-112

Opinion filed March 18, 1980.

Dunham, Boman & Leskera, of East St. Louis (John W. Leskera and William L. Berry, of counsel), for appellant.

Goldenhersh & Goldenhersh, of Belleville (Marvin W. Goldenhersh, of counsel), for appellee.

Mr. JUSTICE HARRISON delivered the opinion of the court:

Appellant Bitzer-Croft Motors, Inc., appeals from a judgment of the circuit court of St. Clair County finding that it was not entitled to possession of a certain 1977 Piper Lance aircraft, and appellee Pioneer Bank & Trust Company cross-appeals from a judgment finding that there was no conspiracy on the part of David Croft and others to deprive it of a security interest in the aircraft. Appellant contends that (1) title to and possession of the aircraft should be resolved under the Uniform Commercial Code as adopted in Illinois rather than the Federal Aviation Act as urged by appellee; (2) the trial court erred in finding that Bitzer-Croft was not a good-faith purchaser (buyer in the ordinary course of business) under the provisions of the Uniform Commercial Code; (3) appellee is estopped under the terms of its chattel mortgage from exercising its security interest in the aircraft; and (4) appellee's notice of

cross-appeal was not timely filed. We affirm in part, reverse in part, and remand with directions.

On November 18, 1977, plaintiff Bitzer-Croft Motors, Inc., an automobile dealership (hereinafter referred to as Bitzer-Croft), by and through its agent, David Croft, entered into a retail purchase order with Southern Illinois Aviation, Inc. (hereinafter referred to as Southern), to purchase a 1977 Piper Lance airplane for $72,925. Michael Tatalovich, an officer of Southern, negotiated the order with Mr. Croft. To establish chain of title, Tatalovich delivered Bitzer-Croft three bills of sale on November 23, 1977: A purchaser's copy of the bill of sale from Aviation Distributors, Inc., to Ken Paul Aircraft, Inc., an original bill of sale from Ken Paul Aircraft, Inc., to Southern, and the original and purchaser's copy of the bill of sale from Southern to Bitzer-Croft. The document evidencing sale from Ken Paul Aircraft, Inc., to Southern was an undated, partially handwritten bill of sale which Ken Paul testified he prepared when Tatalovich informed him that the original had been lost. These documents, except the original bill of sale from Southern to Bitzer-Croft, were delivered by Croft to the Bank of Belleville prior to December 13, 1977, in order to obtain financing in the sum of $62,000 for the plane and for the bank to perfect its security interest in the plane. That original bill of sale from Southern to Bitzer-Croft apparently was sent on December 15, 1977, by David Croft with an aircraft registration application to the Federal Aviation Administration in order to register the aircraft in the name of Bitzer-Croft, which was done on February 9, 1978.

On December 14, 1977, Croft received a phone call from Tatalovich requesting immediate payment for the plane by Bitzer-Croft since Tatalovich had issued a draft to Ken Paul Aviation, Inc., and needed the payment in order to cover his draft. Tatalovich said the plane would be returned to Ken Paul Aviation, Inc., if Bitzer-Croft did not issue immediate payment. Croft and Earle Bitzer, as officers and agents of Bitzer-Croft, executed a promissory note, security agreement and aircraft chattel mortgage on December 15, 1977, to the Bank of Belleville and received a draft for $62,000 which together with a check for $11,000 drawn on Bitzer-Croft's account was delivered to Southern. Possession of the aircraft was then taken by Bitzer-Croft, although it remained on the premises of Southern at its place of business in Cahokia, Illinois. Southern then refunded, allegedly as a sales commission, $11,000 to Croft and Earle Bitzer in equal shares. There were, then, discrepancies between the original order price, the gross amount paid by Bitzer-Croft, and the net amount retained by Southern. A subsequent handwritten purchase order dated December 15, 1977, was entered between Bitzer-Croft and Southern, by David Croft and Michael Tatalovich respectively, reflecting a purchase price of $62,000.

On the same day Bitzer-Croft and Southern entered their agreement, November 18, 1977, Tatalovich obtained a loan for Southern from defendant Pioneer Bank & Trust Company (hereinafter referred to as Pioneer) in the sum of $61,000 executing a chattel mortgage and pledging the subject 1977 Piper Lance aircraft as security. This was accomplished by Tatalovich's delivery to Pioneer of the first original bill of sale from Ken Paul Aviation, Inc., to Southern, the second original having been delivered to Bitzer-Croft, as well as the original bills of sale from Piper Aircraft Corporation to Aviation Distributors, Inc., and from Aviation Distributors, Inc., to Ken Paul Aviation, Inc. On November 18, an agent of Pioneer called the Insured Aircraft Title Service, Inc., in Oklahoma City, Oklahoma, to check the ownership status of the subject aircraft which at that time was listed as unregistered. The loan was then extended to Southern according to Pioneer installment loan officer Don Garner, as part of Southern's floor plan financed by Pioneer and with knowledge that the aircraft would constitute part of Southern's sales inventory and that it would be or may already have been sold. The chattel mortgage as well as the three aforesaid original bills of sale were filed by Pioneer with the Federal Aviation Administration on November 28, 1977, five days after the bills of sale were transferred from Southern to Bitzer-Croft, and recorded therewith on December 16, 1977.

Also in December 1977, after the loan had been extended to Bitzer-Croft, the Bank of Belleville filed the documents in its possession with the Federal Aviation Administration. Betty Evans, a loan officer for the Bank of Belleville, made a phone call to Insured Aircraft Title Service, Inc., which reported that a certain document pertaining to the aircraft had been received by the Federal Aviation Administration but had not as yet been recorded. Ms. Evans requested a written report regarding the plane, but no further document search was performed by the Bank of Belleville. The documents from the Bank of Belleville regarding the plane were received by the Federal Aviation Administration on January 26, 1978, and recorded therewith on February 9, 1978.

Southern subsequently went out of business. Don Garner testified that because Southern had been delinquent in the payment of certain notes a floor plan check was pursued in February 1978. At that time he discovered that the aircraft had been sold by Southern and that Bitzer-Croft and the Bank of Belleville were named insureds on the policy covering the plane. Garner then notified Ms. Evans that Pioneer had an unsatisfied lien on the plane, but the aircraft was repossessed on February 15, 1978, by Pioneer's agents before David Croft and the Bank of Belleville could get a satisfactory explanation from Tatalovich as to the existence of another lien. Prior to the repossession of the plane, Garner had called Insured Aircraft Title Service, Inc., to determine the

ownership status of the plane, but he testified that "[e]vidently they were so busy they weren't going to call back until the next day." Rather than waiting for the return call, the plane was repossessed. The day after repossession, a title search by Insured Aviation Title Service, Inc., showed the record owner of the aircraft to be Bitzer-Croft. Mr. Garner agreed that had he resolved the ownership status of the plane on February 15, the Federal Aviation Administration documents would have shown Bitzer-Croft as the owner of the plane.

Bitzer-Croft subsequently filed suit to recover possession of the aircraft, to obtain clear title thereto, and for damages for loss of use of the plane, punitive damages and attorney's fees. Pioneer filed a third-party action charging David Croft with conspiracy in conjunction with officers and agents of Southern to defraud Pioneer of its security interest in the plane. After a bench trial, the trial court found on December 28, 1978, that Bitzer-Croft was not a "good faith" purchaser, that David Croft should have made further inquiry into the chain of title to the plane because of his experience in financing and floor-planning automobiles and aircraft, and that Pioneer had perfected its security interest in the plane and was therefore entitled to its immediate possession. The court, however, found against Pioneer on its action alleging conspiracy.

On January 18, 1979, Bitzer-Croft filed a notice of appeal. On January 26, 1979, Pioneer filed a post-trial motion which was denied on February 9, 1979. Pioneer subsequently filed a notice of cross-appeal on February 20, 1979, with Bitzer-Croft filing no new notice of appeal. This is the posture in which the case is presented to this court.

■■ We must initially address a question of first impression in Illinois, that being whether the Federal Aviation Act, which establishes a system of recordation of aircraft title, affects the priorities under the Uniform Commercial Code between prior security interests and subsequent buyers. A comprehensive registration system was first created by section 503 of the Civil Aeronautics Act of 1938 (49 U.S.C. §503 (1938)). This statute was superseded by section 503 of the Federal Aviation Act of 1958 (49 U.S.C. §1403 (1958)) and was amended in 1964 (Pub. L. No. 88-346, §2, 78 Stat. 236) and 1966 (Pub. L. No. 89-670, 80 Stat. 931). Section 1403 as amended provided in relevant part:

"(a) The Administrator shall establish and maintain a system for the recording of each and all of the following:

(1) Any conveyance which affects title to, or any interest in, any civil aircraft of the United States;

(2) * * * any mortgage, * * * or other instrument executed for security purposes, * * *;
* * *

(c) No conveyance or instrument the recording of which is

provided for by subsection (a) of this section shall be valid in respect of such an aircraft * * * against any person other than the person by whom the conveyance or other instrument is made or given, his heir or devisee, or any person having actual notice thereof, until such conveyance or other instrument is filed for recordation in the office of the Administrator * * *.

(d) Each conveyance or other instrument recorded by means of or under the system provided for in subsection (a) or (b) of this section shall from the time of its filing for recordation be valid as to all persons without further or other recordation * * *."

Also, in 1964, section 506 of the Act (49 U.S.C. §1406 (1964), Pub. L. No. 88-346 §1(a), 78 Stat. 236), was added as follows:

"The validity of any instrument the recording of which is provided for by section 1403 of this title shall be governed by the laws of the State, District of Columbia, or territory or possession of the United States in which such instrument is delivered, irrespective of the location or the place of delivery of the property which is the subject of such instrument."

Based on these statutes, it can be seen the Congress has preempted the field by enacting this system of aircraft title registration, and that State recording statutes are inapplicable to such instruments. *State Securities Co. v. Aviation Enterprises, Inc.* (10th Cir. 1966), 355 F.2d 225, 229; *Texas National Bank v. Aufderheide* (E.D. Ark. 1964), 235 F. Supp. 599, 603. ■■ ■ However, it is also clear that Congress did not preempt every aspect of the field to the mutual exclusion of State law. Senate Commerce Committee Report No. 1060, which accompanied the bill subsequently enacted as 49 U.S.C. §1406, stated:

"It establishes a uniform Federal rule governing the validity of instruments affecting title to or interests in aircraft and related equipment. The rule would apply to all instruments subject to the recording provisions of §503 of the Federal Aviation Act. Included would be various instruments executed for security purposes such as conveyances, leases, *mortgages*, equipment trusts, conditional sales contracts, etc. Assignments, amendments, and supplements to such instruments would similarly be covered. To determine the validity of such an instrument, one would need only to look to the substantive law of the particular State in which the relevant instrument was delivered." (Emphasis added.) (2 [1964] U.S. Code Cong. & Ad. News 2319, 2320.)

It is settled that the underlying validity of such title instruments is resolved under State law. (*Aircraft Investment Corp. v. Pezzani & Reid Equipment Co.* (E.D. Mich. 1962), 205 F. Supp. 80, 82; *Idabell National Bank v. Tucker* (Okla. App. 1976), 544 P.2d 1287, 1290; see Annot., 22

A.L.R.3d 1270, 1275 (1968).) Indeed, it has been held that " 'state law should apply to determine any question arising in connection with a security interest in aircraft.' " *Southern Jersey Airways, Inc. v. National Bank of Secaucus* (1970), 108 N.J. Super. 369, 261 A.2d 399, 411.

> "Thus there has been preemption by federal law only to the limited extent that Congress has sensibly federalized choice of law, thereby freeing aircraft financing from the forum shopping which the rule of *Klaxon Company v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941), might otherwise produce." *Sanders v. M. D. Aircraft Sales, Inc.* (3d Cir. 1978), 575 F.2d 1086, 1088.

The purpose of the Act is laudable.

> "The purpose of Congress in enacting the Federal Aviation Act and its predecessor statute was reportedly to eliminate the confusion engendered by a multitude of state recording systems by providing a single national filing system for registering documents of title and security documents of the kind normally comprehended by state laws. The reason was that the ready mobility of aircraft and their common use across state lines made it cumbersome and burdensome for persons having concern with title to or incumbrances on aircraft to have to record or search title in all jurisdictions that could arguably constitute the proper recording situs of the aircraft security interest. Congress did not intend, however, to create affirmative priority of federally recorded interests as against competing rights declared by state law. *Industrial Bank of Rhode Island v. Butler Aviation International, Inc.*, 370 F. Supp. 1012 (E.D.N.Y. 1974), *Southern Jersey Airways, Inc. v. National Bank of Secaucus*, 108 N.J. Super. 369, 261 A.2d 399 (1970)." (*Haynes v. General Electric Credit Corp.* (W.D. Vir. 1977), 432 F. Supp. 763, 765, *aff'd* (4th Cir. 1978), 582 F.2d 869.)

Hence, it is clear that the mere fact of filing an instrument with the Federal Aviation Administration pursuant to the provisions of 49 U.S.C. §1403 is not the single determinative factor in resolving a priority dispute under the otherwise applicable provisions of the Uniform Commercial Code. Preference, therefore, is not solely resolved under the Federal Aviation Act as urged by Pioneer.

The Uniform Commercial Code as adopted in Illinois (Ill. Rev. Stat. 1977, ch. 26, pars. 1—101 through 11—108) (hereinafter referred to as the Commercial Code) clearly provides that a buyer in the ordinary course of business prevails over the holder of a perfected security interest. Section 9—307(1) (Ill. Rev. Stat. 1977, ch. 26, par. 9—307(1)) mandates the priority as follows:

"(1) A buyer in ordinary course of business (subsection (9) of Section 1—201) other than a person buying farm products from a person engaged in farming operations takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence."

Section 1—201(9) (Ill. Rev. Stat. 1977, ch. 26, par. 1—201(9)) defines a "buyer in the ordinary course of business":

"[A] person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind but does not include a pawnbroker. All persons who sell minerals or the like (including oil and gas) at wellhead or minehead shall be deemed to be persons in the business of selling goods of that kind. 'Buying' may be for cash or by exchange of other property or on secured or unsecured credit and includes receiving goods or documents of title under a pre-existing contract for sale but does not include a transfer in bulk or as security for or in total or partial satisfaction of a money debt."

Based on the foregoing Commercial Code provisions, appellant contends that Bitzer-Croft was a buyer in the ordinary course of business and was therefore entitled to possession and clear title to the aircraft. However, whether Bitzer-Croft was a "buyer in the ordinary course of business" pursuant to sections 1—201(a) and 9—307(1) of the Uniform Commercial Code (Ill. Rev. Stat. 1977, ch. 26, pars. 1—201(9) and 9—307(1)) is not the next determination to be made. In accordance with 49 U.S.C. §1406, we must first resolve whether the chattel mortgage and bills of sale filed by Pioneer with the Federal Aviation Administration were valid under State law and sufficient to create a lien in its favor or deciding whether Bitzer-Croft achieved such a buyer status as to have priority notwithstanding that lien. We therefore consider the validity and effect of the instruments filed by Pioneer.

Appellant argues that Pioneer is estopped from exercising its security interest in the plane because of certain provisions in the chattel mortgage between Pioneer and Southern. We agree. That agreement provided in pertinent part as follows:

"Mortgager shall be entitled to exhibit and sell each of said Chattels at retail in the regular course of trade for the account of the Mortgagee * * * plus interest * * * and Mortgagor shall hold the proceeds of any sale as Trustee for Mortgagee separate and apart from his own funds * * *."

Moreover, not only did the chattel mortgage authorize the sale of the aircraft by Southern, but it was acknowledged by Don Garner, Pioneer's installment loan officer, that he contemplated the plane would be sold by

Southern and that at the time the loan was made, a good prospect for sale existed.

The chattel mortgage between Pioneer and Southern also provided that in the event of default, all obligations on the part of Southern could be accelerated at the option of Pioneer as mortgagor, "and in addition to all of the rights and remedies herein provided, Bank [Pioneer] shall have all the rights and remedies of a secured party under the Uniform Commercial Code of the State where the Chattels are to be kept as provided herein in force at the date of this Security Agreement." Since the aircraft was to be held at Southern's place of business in Cahokia, Illinois, there can be no dispute that the agreement between the parties contemplated reference to the Commercial Code of Illinois as a means by which Pioneer could enforce its rights against Southern.

It is clear that this agreement termed "Chattel Mortgage" operates as a security agreement under the provisions of the Commercial Code of Illinois. (Ill. Ann. Stat., ch. 26, par. 9—105(1), Illinois Code Comment, subsection (1), par. (1) (Smith-Hurd 1974).) Therefore, Pioneer and Southern were bound by the terms of that agreement unless otherwise modified by the Commercial Code. (Ill. Rev. Stat. 1977, ch. 26, par. 9—201.) That being the case, the section 9—307(1) limitations as to buyers in the ordinary course of business apply "only to unauthorized sales by the debtor. If the secured party has authorized the sale in the security agreement or otherwise, the buyer takes free without regard to the limitations of this section." (Ill. Ann. Stat., ch. 26, par. 9—307, Uniform Commercial Code Comment 2 (Smith-Hurd 1974).) The effect of an authorized sale is set forth in section 9—306, which states the right of a secured party to the collateral when the sale is unauthorized. Section 9—306(2) provides:

> "(2) Except where this Article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof *unless the disposition was authorized by the secured party in the security agreement or otherwise,* and also continues in any identifiable proceeds including collections received by the debtor." (Emphasis added.) (Ill. Rev. Stat. 1977, ch. 26, par. 9—306(2).)

As noted above, Pioneer expressly authorized the sale of the Piper Lance airplane in the chattel mortgage, the instrument upon which it relies to claim a valid prior lien, and otherwise, according to the testimony of Don Garner. Such authorizations are controlling over the clause cited by Pioneer which provides that the chattel shall be kept at Southern's place of business until the mortgage is satisfied in full. Therefore, Pioneer is bound by these authorizations and cannot neglect that language of its own instrument by arguing that the mere physical act of filing it overrides the

importance of the language contained therein. The Federal Aviation Act, deferring to State law, mandates otherwise.

Pioneer nonetheless contends that the aircraft was not sold "in the regular course of trade" as required by the chattel mortgage and that, therefore, appellant's estoppel argument falls. Such a contention is clearly erroneous. Southern was undisputably an aircraft dealer. Pioneer floor-planned the aircraft which Southern sold, meaning, according to Garner, that Pioneer financed the merchandise which was held by the dealer for sale, namely airplanes. Southern engaged in such a sale when it entered into a written agreement with Bitzer-Croft through their respective agents for the purchase of the 1977 Piper Lance. Pioneer's assertions to the contrary are unfounded.

Our conclusion that Pioneer is estopped from asserting its security interest based upon its oral and written consent to the sale of the plane is in accordance with the case law in this State. In a case factually similar to ours, the First District Appellate Court held in *Draper v. Minneapolis-Moline, Inc.* (1968), 100 Ill. App. 2d 324, 241 N.E.2d 342, that when a dealer contracted for the sale of a tractor to plaintiff-purchaser, which sale was authorized by a trust receipt and financing agreement between the tractor manufacturer and the dealer, emphasis on whether the purchaser was a buyer in the ordinary course of business was misplaced. Rather, the threshold determination was not the status of the buyer but whether the sale was an authorized one under the agreement between the secured party and the debtor. Citing Uniform Commercial Code Comment 2 to section 9—307, the court held:

> "Here the sale of the tractor to plaintiff was not unauthorized. Rather, both the trust receipt and the trust receipt financing agreement gave the dealer (seller) the express authority to sell the tractor at retail in the ordinary course of business, and provided that the security interest would attach to the proceeds of sale. The very intent of the commercial papers involved was that the tractor could be sold to a buyer, (see: section 2—103(1)(a)), free and clear of the security interest of the seller's creditor. Accordingly, we hold that plaintiff obtained his special property interest in the tractor free and clear of defendant's security interest * * *." (100 Ill. App. 2d 324, 329.)

Therefore, the court held that a cause of action for damages against the manufacturer was stated when it repossessed the tractor from the dealer.

Likewise, the Second District Appellate Court has applied the rationale of section 9—306(2) regarding authorized sales without reference thereto. In *Coffman Truck Sales v. Sackley Cartage Co.* (1978), 58 Ill. App. 3d 68, 373 N.E.2d 1026, one dealer (Coffman) transferred two trucks for sale to another dealer (Interstate), who subsequently sold them to

defendant. When Interstate went out of business and failed to pay for the trucks, Coffman brought an action to replevy the trucks from the buyer. While the court found the buyer to be one in the ordinary course of business, it noted particularly "that it was plaintiff which placed the trucks into the stream of commerce, well aware that Interstate intended to sell them, and that plaintiff nonetheless waited 2½ months before even attempting to collect payment from Interstate. It is our view that the consumer should not be the one to bear the loss under such circumstances, even when that consumer is a commercial corporation." 58 Ill. App. 3d 68, 69.

Pioneer attempts to distinguish these two cases on the grounds that they involve merchandise other than aircraft and that the buyers therein were found to be buyers in the ordinary course of business. However, the type of merchandise in question is irrelevant, since even under the Federal Aviation Act we must turn to the Commercial Code to determine the validity of the instruments filed with respect to aircraft. These cases were resolved pursuant to the Code and reflect the rule that a party who authorizes the sale cannot be heard to complain later that the authorization did not also run to its security interest in the collateral sold. By the same token, whether the buyer is one in the ordinary course or not is irrelevant, since under section 9—306(2), authorization of a sale constitutes abandonment of a security interest theretofore existing in the collateral. It is the authorization, not the status of the buyer, which is of pivotal importance. For that reason, the cases upon which Pioneer relies, namely, *Dowell v. Beech Acceptance Corp.* (1970), 3 Cal. 3d 544, 476 P.2d 401, 91 Cal. Rptr. 1, *cert. denied* (1971), 404 U.S. 823, 30 L. Ed. 2d 50, 92 S. Ct. 45, *O'Neill v. Barnett Bank* (Fla. 1978), 360 So.2d 150, *Crescent City Aviation, Inc. v. Beverly Bank* (1966), 139 Ind. App. 669, 219 N.E.2d 446, and *Smith v. Eastern Airmotive Corp.* (1968), 99 N.J. Super. 340, 240 A.2d 17, are inapposite, since in none of them did the secured party consent to the initial disposition of the collateral as is Pioneer here.

Numerous other cases have discussed the application of an estoppel theory when the secured party has authorized the sale in question. In the *State Securities Co.* case, a foreclosure action was brought by the mortgagee on a chattel mortgage on an airplane where the insolvent mortgagor, an aircraft dealer, had sold it to a buyer in the ordinary course of business. The Tenth Circuit Court of Appeals looked to State law to determine the priorities of lien holders and held that where the mortgagee had permitted the debtor to retain possession of the aircraft knowing that its sale at retail was contemplated and that the loan would be satisfied out of the proceeds of the sale, the party who had perfected his interest under Federal law would not prevail. The court, citing *Bordman Investment Co. v. Peoples Bank* (Mo. App. 1958), 320 S.W.2d 72, 76, acknowledged

that "[i]n almost all jurisdictions the recognized rule is that where a mortgagee of an automobile or other chattel knows the mortgagor is a dealer, buying to sell the automobile or other chattel in the regular course of business, and consents to its sale by the mortgagor, the purchaser takes free from the mortgagee's lien." 355 F.2d 225, 229.

The underlying policy considerations for such a rule had been earlier enunciated by Chief Judge Henley in *Texas National Bank v. Aufderheide*, another chattel mortgage foreclosure case where the mortgagee knew the aircraft would be sold in the debtor's regular course of business and the proceeds of the sale used to pay off the secured loan.

> "Ordinarily, when a person goes into a merchant's place of business to make a purchase, whether it be of an automobile, a television set, a washing machine, or a pound of nails, the purchaser ought to have the right to assume that the merchant has a right to sell the commodity in question and should not be required to make a record search before purchasing or to see to it that the merchant obtains a valid release of the item from a bank floor plan before delivering it to the purchaser and receiving his money or obligation. The Court sees no reason why that right should not extend to the purchaser of an airplane who buys it from a recognized dealer from a regular inventory or display and in the ordinary course of business." (235 F. Supp. 599, 604.)

The court also relied on the general rule that

> "* * * when a mortgagee consents to the sale of a mortgaged chattel free of lien by the mortgagor, the purchaser takes free of the mortgage lien and his rights are superior to those of the mortgagee. * * * [C]onsent to sell mortgaged property consisting of a stock of goods is implied from the fact that the mortgagor is permitted by a provision in the mortgage to remain in possession of the property, or from the fact that the mortgagee accepted a mortgage on such property and permitted the mortgagor to remain in possession thereof with knowledge that it would be exposed and offered for sale by the mortgagor in the ordinary course of trade." 235 F. Supp. 599, 603-04.

In *Sanders v. M. D. Aircraft Sales, Inc.*, the Third Circuit Court of Appeals was confronted with an airplane buyer, Sanders, who sought declaratory and injunctive relief against the finance company, GECC, which asserted a lien on an aircraft he had purchased in the ordinary course of business from M. D. Aircraft Sales, Inc., an airplane dealer and debtor of GECC. The security agreement which GECC and the dealer entered into contained language regarding the right to sell inventory, satisfaction of the debt out of the sale proceeds, and recourse to Uniform

Commercial Code rights and remedies, very similar to that of the agreement in the case at bar. The court then analyzed the case as follows:

"In this case the security agreement was delivered in Pennsylvania. The federal recording statute establishes that Sanders had notice of the security interest. But Pennsylvania law determines the validity of the lien against him. Indeed the very text of the security agreement, by referring to the Uniform Commercial Code in the dealer's state, acknowledges as much. GECC does not suggest that under Pennsylvania law a holder of a floor plan lien can prevail over a purchaser in the ordinary course of business. In fact, under Pennsylvania law a purchaser in the ordinary course of business prevails even if the security agreement does not contain an express power of sale. Pa. Stat. Ann. tit. 12A, §9—307(1). *Where, as here, the agreement does contain an express power of sale, it is an* a fortiori *case.*

Moreover, even if Congress had intended totally to preempt the state law of aircraft liens, a federal court would still be required to choose an appropriate federal rule as to the effect of a security agreement creating a floor plan lien but containing a power of sale. The only appropriate rule, we think, would be to give effect to the very terms of the security agreement. According to those terms, the GECC lien was transferred to the proceeds of sale, and Sanders took free and clear title to the aircraft." (Emphasis added.) (575 F.2d 1086, 1089.)

In accordance with the aforesaid cases, the priority of purchasers who buy inventory subject to security agreements over sellers which have consented to the sale or waived their rights to enforce their liens has been recognized so as not to frustrate the policy embodied in State law. *Aircraft Investment Corp. v. Pezzani & Reid Equipment Co.* (E.D. Mich. 1962), 205 F. Supp. 80; *Suburban Trust & Savings Bank v. Campbell* (Montgomery Co. C.P. 1969), 19 Ohio Misc. 74, 250 N.E.2d 118.

This is not to say that some cases, such as *Dowell v. Beech,* relied on by Pioneer, have not sanctioned priority for interests recorded pursuant to 49 U.S.C. §1403. However, those cases have, in our view, misinterpreted the scope and effect which 49 U.S.C. §§1403 and 1406 were meant to have. In this regard, we find persuasive the following language from the opinion of the Honorable Judge Dalton in *Haynes v. General Electric Credit Corp.*:

"The court recognizes the competing policy arguments set forth in the cases cited by the defendant which grant priority to federally recorded interests. In *Dowell v. Beech,* 3 Cal. 3d 544, 91 Cal. Rptr. 1, 476 P.2d 401 (1970), the court ruled that the overriding

federal policy favoring the recordation of security interests would be 'eviscerated' by a rule which relies on state laws to protect the buyer in the ordinary course of business. In so holding the court relied on *In re Veterans' Air Express Co.*, 76 F. Supp. 684 (D.N.J. 1948), which contains language suggesting that Congress has preempted the entire field of aircraft financing. This view, however, has twice been rejected in *Southern Jersey Airways, supra* and *Aircraft Investment Corporation v. Pezzani and Reid Equipment Co.*, 205 F. Supp. 80 (E.D. Mich. 1962) which stated that:

> Plaintiff suggests that Congress has pre-empted the entire field of conveyancing of interests in aircraft. This view is erroneous, notwithstanding *In re Veterans' Air Express Company*, 76 F. Supp. 684 (D.N.J. 1948), which contains dicta on which plaintiff relies. Congress has said only that until an instrument purporting to convey an interest in an aircraft is recorded, in accordance with the Act, it is void as to third parties without notice. Upon federal recordation, it is valid without further recording. In providing for the recordation of various instruments pertaining to transactions affecting title or interest in aircraft, Congress has not impaired the existence and effectiveness of state laws creating and defining such instruments. Excepting the recording section of the Federal Aviation Act, the validity of the chattel mortgage here in question must be measured by the appropriate state law.

With regard to the *Dowell* holding, the court finds it difficult to perceive how the policy underlying the Federal Aviation Act would be eviscerated by resorting to state laws to determine priorities among interests in aircraft. It has already been established that Congress, by enacting the recording provisions of the statute, intended merely to provide a single location for the filing of such interests in an effort to alleviate the problems inherent in recording security interests in highly mobile collateral throughout many states. There is no evidence that Congress ever intended to create a new system of priorities and the absence of any language concerning priorities in the statute undermines and eviscerates the holding in *Dowell*.

It might also be added that the *Dowell* case is distinguishable from the facts of the present case. In *Dowell*, the aircraft was originally sold by Nevadair, a distributor, to a dealer, Tanger, under a security agreement which provided that Tanger was not to sell the plane without Nevadair's consent. Had the plaintiff in that

case examined the title, he would have found that the lien of Nevadair prohibited a sale to him or to any other consumer. In the instant case, however, the security agreement contained no such restriction and even permitted a sale in the ordinary course of business. Thus even if the plaintiff herein searched the title to the aircraft, the FAA records would have revealed no such restrictions on its sale." 432 F. Supp. 763, 768.

We find that these circumstances compel a finding in favor of Bitzer-Croft. It purchased the Piper Lance from the inventory of Southern, a recognized aircraft dealer. Pioneer financed Southern's acquisition of the airplane by means of a demand note and chattel mortgage which it drafted and which expressly permitted a sale, such as one to Bitzer-Croft, in the regular course of Southern's business. The parties contemplated that Southern's obligation to Pioneer would be satisfied solely out of the proceeds of such a sale. The agreement looked to the Commercial Code of Illinois as a means by which Pioneer could enforce its rights against Southern in the event of the latter's default. Pursuant to section 9—306(2) of the Commercial Code (Ill. Rev. Stat. 1977, ch. 26, par. 9—306(2)), and that portion of the chattel mortgage requiring segregation of the proceeds of the sale, Pioneer's security interest continued only in the proceeds of the sale of the aircraft to Bitzer-Croft and not in the aircraft itself. The express authorization by Pioneer to Southern that the plane could be sold as part of its regular inventory means that as between Bitzer-Croft and Pioneer, Pioneer must bear the loss occasioned by the default of Southern, and that Pioneer's remedy lies against Southern, not Bitzer-Croft. (Ill. Rev. Stat. 1977, ch. 26, par. 9—306.01.) This is so whether or not Bitzer-Croft is a buyer in the ordinary course of business, a question we need not and do not resolve pursuant to Ill. Rev. Stat. 1977, ch. 26, par. 9—306(2) and Ill. Ann. Stat., ch. 26, section 9—307(1), Illinois Code Comment, Uniform Commercial Code Comment 2 (Smith-Hurd 1974).

Appellant further contends that Pioneer's notice of cross-appeal was not timely filed. The trial court entered its judgment on December 28, 1978. Bitzer-Croft filed its notice of appeal on January 18, 1979, within the 30-day limitation of Supreme Court Rule 303(a). (Ill. Rev. Stat. 1977, ch. 110A, par. 303(a).) Pioneer filed a post-trial motion on January 26, 1979, which was denied on February 9, 1979. That motion was also filed within the 30-day time period mandated by par. 68.3 of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 68.3). Not until February 20, 1979, did Pioneer file its notice of cross-appeal from the judgment entered for Bitzer-Croft on the third-party action for conspiracy. However, we conclude that Pioneer's notice was timely filed.

■■ We initially take notice of Supreme Court Rule 301 which reads in relevant part:

"Every final judgment of a circuit court in a civil case is appealable as of a right. The appeal is initiated by filing a notice of appeal. No other step is jurisdictional." (Ill. Rev. Stat. 1977, ch. 110A, par. 301.) When a final judgment has been rendered by the trial court, notice of appeal from that judgment confers jurisdiction upon this court. Therefore, we must first resolve the question whether this court obtains jurisdiction pursuant to Supreme Court Rules 301 and 303(a) after a notice of appeal was filed but before a subsequent post-trial motion was filed by the opposing party under section 68.3 of the Civil Practice Act.

Apparently no Illinois case has squarely resolved this issue. In *Forest City Oil Co. v. Larsen* (1963), 44 Ill. App. 2d 367, 194 N.E.2d 802, the defendant filed a notice of appeal and the plaintiff filed a post-trial motion on the same day—both within the aforesaid 30-day limitations. While the court stated, "We think that notice of appeal procedure is in pari materia with these [post-trial motion] statutes and that it should not and does not operate as a universal straight-jacket [*sic*]," it did not consider the propriety of the trial court's ruling on the post-trial motion because of the rudimentary proposition that an appellate court can only consider issues existing at the time the notice of appeal was filed. (44 Ill. App. 2d 367, 371-72.) However, the court did exercise jurisdiction to reverse the judgment of the trial court even though the trial court had similarly ruled in granting the post-trial motion. Thus it appears that the court found jurisdiction based on the notice of appeal from the initial judgment rather than on the judgment encompassed in the trial court's ruling on the post-trial motion. From this perspective, Pioneer should have filed its notice of cross-appeal within 30 days from the entry of judgment or within 10 days of service of appellant's notice of appeal upon it, pursuant to Supreme Court Rule 303(a) (Ill. Rev. Stat. 1977, ch. 110A, par. 303(a)), rather than approximately three weeks later on February 20, 1979. Such a finding would be contrary to the ruling of the trial court below which rejected Bitzer-Croft's argument that its notice of appeal deprived the trial court of jurisdiction to hear a timely filed post-trial motion.

However, an apparent contrary conclusion was reached in *City of DeKalb v. Anderson* (1974), 22 Ill. App. 3d 40, 316 N.E.2d 653. There, both parties filed timely post-trial motions on the same day. The trial court initially denied defendants' post-trial motion whereupon they filed a motion to vacate that order and subsequently filed a petition for leave to appeal. The court denied the petition for leave to appeal on the ground that there was no final appealable order since plaintiff's post-trial motion was still pending. Thereafter, the trial court allowed defendants' motion to vacate, and plaintiff appealed. The court then held:

"Under such circumstances, we are of the opinion that until the last timely filed post-trial motion has been passed upon, the court

retains complete jurisdiction over the final order under attack to rectify any errors that may have been brought to its attention. Total jurisdiction is essential since the action taken may affect all parties involved." (22 Ill. App. 3d 40, 43.)

The court then stated that the time for filing a notice of appeal was within 30 days after the entry of the order regarding post-trial motions. Therefore, while the case before us does not involve simultaneous post-trial motions, we deem that the court below had jurisdiction to rule on the post-trial motion of Pioneer and that it was that ruling which constituted a final judgment.

■■■ To hold otherwise would allow one party to effectively bar review of another's issues, certainly an untenable result. Section 68.3 of the Civil Practice Act allows *any* party to file a post-trial motion within 30 days of entry of a judgment, and one should not be denied his right to file such a motion just because opposing counsel files a prior notice of appeal. So too, one should not be allowed to affirmatively circumvent section 68.3 by filing a notice of appeal before opposing counsel files his post-trial motion. Either case would frustrate the primary purpose of the post-trial motion, which is to call to the attention of the trial court possible errors and give it the first opportunity to review its rulings in order to avoid multiplicity of litigation and piecemeal appeals.

We find that Pioneer's notice of cross-appeal was timely filed on February 20, 1979. The trial court's denial on February 9, 1979, of the post-trial motions is a final appealable judgment. Therefore, pursuant to Supreme Court Rule 303(a), Pioneer had 30 days from that date to cross-appeal. Said notice of cross-appeal was, then, filed in a timely manner.

Accordingly, we must dispose of the cross-appeal on the merits. Pioneer's post-trial motion, as well as its brief before this court, is an effort to restate the evidence and arguments which were presented to the trial court. We are not at liberty to reverse the judgment of the trial court unless those findings are clearly against the manifest weight of the evidence, for the trial court is in the best position to determine the credibility of witnesses and weigh the evidence. (*Wyman-Gordon Co. v. Lynch Area Fire Protection District* (1977), 51 Ill. App. 3d 451, 453, 366 N.E.2d 1055; *Marth v. Illinois Weather-Seal, Inc.* (1977), 50 Ill. App. 3d 577, 581, 365 N.E.2d 588; *Rankin v. Hojka* (1976), 42 Ill. App. 3d 440, 445-46, 355 N.E.2d 768.) The findings of the trial court are in accordance with the evidence and we therefore affirm the judgment as to the third-party action.

For the reasons stated, we affirm the judgment of the circuit court of St. Clair County against Pioneer on the third-party complaint, we reverse the judgment against Bitzer-Croft on its complaint, and remand with directions that the trial court enter judgment declaring Bitzer-Croft to be

the owner of the Piper Lance aircraft and its ownership interest to be superior to the lien asserted by Pioneer, and that Bitzer-Croft be restored full use, possession and enjoyment of said aircraft free of any encumbrance asserted by Pioneer, and that it conduct further hearings to determine the amount of damages heretofore suffered by Bitzer-Croft, if any.

Judgment affirmed in part, reversed in part and remanded with directions.

JONES, P. J., and KASSERMAN, J., concur.