CENTRAL FINANCE LOAN CORPORATION, Plaintiff-Appellee, v. THE BANK OF ILLINOIS, Defendant-Appellant.

Fourth District   No. 4—86—0297

Opinion filed November 18, 1986.

John E. Maloney, of Maloney & Davis, of Urbana, for appellant.

Arthur M. Lerner, of Greaves, Lerner & Kirchner, of Champaign, for appellee.

JUSTICE GREEN delivered the opinion of the court:

This case concerns the application of sections 9—306(2) and 9—307(1) of the Uniform Commercial Code (UCC) (Ill. Rev. Stat. 1983, ch. 26, pars. 9—306(2), 9—307(1)). Section 9—306(2) states:

"(2) Except where this Article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange

or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor." (Ill. Rev. Stat. 1983, ch. 26, par. 9—306(2).)

Section 9—307(1) states:

"(1) Except as provided in subsection (4), a buyer in the ordinary course of business, as defined in subsection (9) of Section 1—201, takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence." Ill. Rev. Stat. 1983, ch. 26, par. 9—307(1).

■ The controlling question raised here is whether a security interest granted to defendant, the Bank of Illinois, under a security agreement which only authorized its debtor McGrath Auto Sales to sell collateral "in the ordinary course of business" was impaired by a purported sale to Gordon McGrath, who was not a "buyer in the ordinary course of business" and the sale was not one made "in the ordinary course of business." We hold that defendant's security interest was not impaired. Thus, because defendant's security interest was first in time of perfection, it must be given priority over one subsequently given plaintiff, Central Finance Corporation, by Gordon McGrath to secure a loan. (Ill. Rev. Stat. 1983, ch. 26, par. 9—312(5)(a).) This is so even though plaintiff gave value in good faith for its security interest. We reverse the judgment of the circuit court of Champaign County, which ruled that plaintiff's rights were superior.

On February 19, 1986, plaintiff filed a three-count complaint in the circuit court of Champaign County against defendant alleging that plaintiff was entitled to the possession of an automobile then in the possession of defendant. After a bench trial, the court entered an order on April 2, 1986, which found in favor of plaintiff as to count III of the complaint and recited that the other counts of the complaint had been withdrawn by plaintiff. As we have stated, the record indicates that the substance of the order is that plaintiff has a valid prior lien upon the vehicle and is entitled to its possession. Defendant has appealed.

Much of the evidence was received by stipulation. On July 13, 1984, defendant entered into a security agreement with an entity described as "McGrath Auto Sales." The agreement created a continuing security interest in property held by McGrath Auto Sales, whether presently existing or to be acquired in the future, including inventory, accounts and contract rights, chattel paper, tools and equipment, and

all products and proceeds of any such property. The agreement further provided that McGrath Auto Sales could, *"in the ordinary course of business,"* sell any inventory normally held for that purpose. (Emphasis added.) On July 16, 1984, a financing statement recording this transaction was filed with the Secretary of State under section 9—302 of the UCC (Ill. Rev. Stat. 1983, ch. 26, par. 9—302).

On April 5, 1985, McGrath Auto Sales, acting through Gordon Mc-Grath, purchased a Mercedes-Benz automobile from Walter Thurman, who endorsed the assignment portion of the certificate of title, leaving blank the space for designation of the assignee. Thurman also executed an application for issuance of a duplicate certificate of title which untruthfully stated that the original certificate had been lost. On July 2, 1985, the original certificate of title to the Mercedes-Benz was delivered to defendant with a transfer of security interest and a trust receipt instrument which was executed by McGrath Auto Sales. That document stated that McGrath Auto Sales conveyed to defendant a security interest in the automobile and that defendant had loaned McGrath Auto Sales $10,000. Defendant still possessed the original certificate of title at the time of trial.

Sometime after acquiring the vehicle from Thurman, Gordon Mc-Grath, acting on behalf of McGrath Auto Sales, made an application for a new certificate of title for the Mercedes-Benz based upon the fraudulent contention that the original certificate of title had been lost. The Secretary of State issued a new certificate of title to Mc-Grath Auto Sales on July 17, 1985. On August 5, 1985, Gordon Mc-Grath and plaintiff entered into a security agreement which provided that a debt of $18,895.22 owed by Gordon McGrath to plaintiff would be secured by an interest in various items of collateral, including the Mercedes-Benz which McGrath Auto Sales had purchased from Walter Thurman.

On August 10, 1985, the "first assignment of title by dealer" section of the new certificate of title was filled out to indicate that the vehicle had been transferred to Gordon McGrath and that a lien existed in favor of plaintiff. A form indicating that Gordon McGrath was the new owner of the car was executed and filed with the Secretary of State. H. L. McGrath signed the portion of the document which required the signature of the dealer from whom the vehicle was purchased.

In its brief, defendant disputes that any sale was ever made to Gordon McGrath. However, the record seems to indicate that defendant earlier stipulated that a sale had taken place. The evidence also indicated that Gordon McGrath had paid some sales tax on a purchase

of the Mercedes-Benz from McGrath Auto Sales, and other documents indicated that a sale had taken place. The trial court made no finding as to whether a sale had taken place and indicated that even if it had not taken place, the security interest of plaintiff should prevail because of the innocent nature of its position and the statement of its lien in the duplicate certificate of title. We need not consider the matter further because we conclude that, even if a sale did take place, the security interest of defendant remained in force and it was not estopped to enforce it.

Accordingly, we must consider the nature of the sale if one did take place. If such a sale was "in the ordinary course of business," then, clearly, Gordon McGrath and plaintiff, taking an interest from him, would have done so free of defendant's interest by the express terms of section 9—306(2) of the UCC. Another aspect of the sale of which we must take note is that defendant did nothing to perfect its lien pursuant to the requirements of section 3—202 of the Illinois Vehicle Code (Ill. Rev. Stat. 1983, ch. 95½, par. 3—202). However, by the terms of section 3—201(c) of the Illinois Vehicle Code, because defendant's lien was obtained from a dealer, McGrath Auto Sales, defendant was not required to comply with section 3—202 in order to preserve its lien except as against "buyer[s] in the ordinary course of trade" from that dealer. Ill. Rev. Stat. 1983, ch. 95½, par. 3—201(c).

■ The questions of whether a sale is made "in the ordinary course of business" and whether it is made to a buyer "in the ordinary course of business" are, at least, closely related. Section 1—201(9) of the UCC states:

> " 'Buyer in ordinary course of business' means a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind but does not include a pawnbroker. ***." (Ill. Rev. Stat. 1983, ch. 26, par. 1—201(9).)

The foregoing clearly requires that good faith on the part of a buyer is a necessary element in making a buyer one in the "ordinary course of business." Logically, when neither the buyer nor the seller is in good faith, the sale would not be one in the ordinary course of business.

■ We find, as a matter of law, that any sale here between McGrath Auto Sales and Gordon McGrath was neither a sale made "in the ordinary course of business" nor one to a "buyer in ordinary course of business." Gordon McGrath was aware of the fraud to be attempted both against defendant and plaintiff by obtaining a dupli-

cate certificate of title through false pretenses in order to perfect the sale. He was both the purchaser and, at least, an agent of the seller, and his lack of good faith is imputable to both parties to the sale. Thus, any sale to Gordon McGrath did not fully comply with the authority given by the security agreement to sell "in the ordinary course of business" and any such sale to Gordon McGrath did not terminate defendant's lien notwithstanding defendant's not having complied with section 3—201(c) of the Illinois Vehicle Code.

We now return to the heart of the case, which involves the operation of sections 9—306(2) and 9—307(1). As explained in *Draper v. Minneapolis-Moline, Inc.* (1968), 100 Ill. App. 2d 324, 328, 241 N.E.2d 342, 345, cited by plaintiff, section 9—306(2) has the most importance. It operates to discharge an inventory security interest, such as that here, upon a sale of collateral by the debtor merchant possessing the collateral if the sale is authorized by the holder of the security interest. Section 9—307(1) is of significance only if the sale is unauthorized. Under such circumstances, the inventory security interest is invalid against the buyer only if it is a buyer "in the ordinary course of business." This is further explained in the editorial comment to section 9—307, which states in part:

> "The question of whether a buyer qualifies as a 'buyer in ordinary course of business' within the protection of this subparagraph is not reached where sale of the collateral is authorized by the secured party in the security agreement because in that circumstance a security interest does not continue in collateral after sale pursuant to paragraph 9—306(2), regardless of the buyer's status under this subparagraph." Ill. Ann. Stat., ch. 26, par. 9—307(1), Illinois Code Comment, at 53 (Smith-Hurd Supp. 1986).

Plaintiff cites *Finance America Commercial Corp. v. Econo Coach, Inc.* (1983), 118 Ill. App. 3d 385, 454 N.E.2d 1127, and *Bitzer-Croft Motors, Inc. v. Pioneer Bank & Trust Co.* (1980), 82 Ill. App. 3d 1, 401 N.E.2d 1340, as well as *Draper* in supporting a theory that any authority in the debtor dealer to sell collateral inventory enables a purchaser to take free of the security holder's interest, regardless of the restrictions in the nature of the sale or the status of the purchaser. We find no support for plaintiff's position in *Draper.* There, the security agreement authorized a sale in the ordinary course of business and such a sale was made to a buyer in the ordinary course of business. The buyer was held to have a superior right to that of the holder of the security interest in the chattel sold. After careful analysis, we find nothing in *Finance America* which is inconsistent with

our decision here. However, we recognize that our decision may be contrary to *Bitzer-Croft Motors.*

In *Finance America* recreational vehicles had been pledged by a leasing agency as security for a loan. The leasing agency sold them to buyers in the ordinary course of business. In an action by the lender for possession of the pledged vehicles, the Second District upheld the right of the purchasers to the vehicles. In addition to ruling that the purchasers had a prior right because of the sale in due course, the appellate court also stated that no determination that the purchasers were buyers in due course needed to be made because the security agreement between the lender and the leasing agency impliedly authorized a sale of the vehicles, thus estopping the lender, by the terms of section 9—306(2) of the UCC, from claiming a security interest. *Finance America* differs from the instant case in that, here, the authority to sell is expressly stated to be in regard to sales "in the ordinary course of business" while, there, the implied authority to sell was not so limited.

The *Finance America* court did note that the security agreement contemplated sales by the merchant and "a continuing security interest in the proceeds" of such sales in the lender holding the security interest. (*Finance America Commercial Corp. v. Econo Coach, Inc.* (1983), 118 Ill. App. 3d 385, 388, 454 N.E.2d 1127, 1129.) However, that statement was made in the context of a situation where the security agreement did not limit the authority to sell. Thus, the statement did not indicate that when an unauthorized sale not to a buyer in the ordinary course of business was made, the sole security interest of the creditor would be in the proceeds of the unauthorized sale.

In *Bitzer-Croft Motors* the Fifth District held that the rights of a purchaser of an airplane were superior to those of a creditor of the seller to whom the plane had been pledged to secure a loan by the provisions of a security agreement. The appellate court held that the buyer took the plane free of the security interest. While provisions of the Federal Aviation Act of 1958 were applicable (49 U.S.C. secs. 1403, 1406 (1982)) the intent of Congress was that the UCC provisions of the appropriate State, here, Illinois, were to control. The security agreement authorized the dealer " 'to exhibit and sell each of said Chattels at retail *in the regular course of trade* ***.' " (Emphasis added.) (*Bitzer-Croft Motors, Inc. v. Pioneer Bank & Trust Co.* (1980), 82 Ill. App. 3d 1, 8, 401 N.E.2d 1340, 1346.) The authority in the security agreement is substantially the same as that in the instant case.

In *Bitzer-Croft Motors*, Pioneer Bank and Trust Company held

the security interest, Southern Illinois Aviation, Inc., was the seller, and Bitzer-Croft Motors was the purchaser. In discussing whether the sale was within the authority of the security agreement, the court stated:

> "Pioneer nonetheless contends that the aircraft was not sold 'in the regular course of trade' as required by the chattel mortgage and that, therefore, appellant's estoppel argument falls. Such a contention is clearly erroneous. Southern was undisputably an aircraft dealer. Pioneer floor-planned the aircraft which Southern sold, meaning, according to Garner, that Pioneer financed the merchandise which was held by the dealer for sale, namely airplanes. Southern engaged in *such a sale* when it entered into a written agreement with Bitzer-Croft through their respective agents for the purchase of the 1977 Piper Lance. Pioneer's assertions to the contrary are unfounded." (Emphasis added.) 82 Ill. App. 3d 1, 10, 401 N.E.2d 1340, 1347.

The case had been initiated by Bitzer-Croft, which sought to obtain the airplane from Pioneer, which had taken possession of it. Pioneer filed a third-party action alleging that several officers of Bitzer-Croft had conspired against it to illegally destroy its security interest. The trial court found for the officers on the third-party complaint, and the appellate court upheld that determination. Evidence was apparently presented that some of these officers had received large commissions from Southern for bringing about the sale to the officer's principal, Bitzer-Croft. This evidence would have borne on the question of whether the sale was " 'in the regular course of trade.' "

In the context of the evidence in *Bitzer-Croft Motors*, the meaning of the court's statement in the previous quotation that "Southern engaged in such a sale" is not certain. If the court meant that "such a sale" was one " 'in the regular course of trade,' " then that decision is consistent with ours here. On the other hand, if the court meant that any sale, regardless of the restrictions placed in the security agreement, was sufficient to defeat the interests of the security holder because of the "floor-planned" nature of the security agreement, the decision is contrary to our holding.

■ We are in agreement with the Fifth District's analysis that if authority for the sale was given, section 9—306(2) operated to terminate the security interest regardless of whether the purchaser of the airplane was a "buyer in due course of business" within the meaning of section 9—307(1). We cannot agree that when the sole authority to sell in a security agreement is "in the regular course of trade," a sale by a seller, who is in bad faith, to a buyer, similarly in the wrong, op-

erates to discharge the lien created by a security agreement whereby inventory is "floor-planned." As we have indicated, we interpret the combined operation of sections 9—306(2) and 9—307(1) to be such that collateral is relieved of an inventory lien (1) by the terms of section 9—306(2) if the sale is made as authorized by the terms of the security agreement, or (2) in any event, by the terms of section 9—307(1) if the purchaser is a "buyer in the ordinary course of business." Because of the combined force of sections 9—306(2) and 9—301(7), there is no need to destroy the lien by the terms of section 9—306(2) when a merchant has authority to sell in the ordinary course of business but makes an irregular sale in bad faith. Section 9—307(1) protects a good-faith purchaser under those circumstances. Where, as here, the seller was limited to good-faith sales and neither the buyer nor the seller was in good faith, the inventory security interest should not be and is not discharged.

We recognize, as did the trial court, that there is an additional dimension to this case. That is the innocent position of the plaintiff. However, plaintiff's security interest also arises under a security agreement which gives Gordon McGrath power to sell "in the ordinary course of business." In dealing with these two innocent parties, similarly situated, the policy of the UCC is that set forth in section 9—312(5)(a) that "[c]onflicting security interests rank according to priority in time of filing or perfection." Ill. Rev. Stat. 1983, ch. 26, par. 9—312(5)(a); see *First National Bank & Trust Co. v. Ford Motor Credit Co.* (1982), 231 Kan. 431, 646 P.2d 1057.

As we have indicated, we reverse the judgment of the circuit court of Champaign County and remand the cause to that court with directions to enter an order placing the prior security interest in the Mercedes-Benz in defendant and awarding it possession of the vehicle.

Reversed and remanded with directions.

MORTHLAND and SPITZ, JJ., concur.