No. 53,260

FIRST NATIONAL BANK AND TRUST COMPANY OF EL DORADO, KANSAS, *Appellee,* v. FORD MOTOR CREDIT COMPANY, *Appellant,* and HERITAGE FORD LINCOLN MERCURY, INC.

(646 P.2d 1057)

Opinion filed June 11, 1982.

*Rex G. Beasley,* of Fleeson, Gooing, Coulson & Kitch, of Wichita, argued the cause, and *William P. Tretbar,* of the same firm, was with him on the briefs for the appellant.

*James L. Hargrove,* of McKay, McKay & Hargrove, of El Dorado, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

FROMME, J.: This controversy is between a bank and a credit company, both claiming prior security interests in three vehicles allegedly sold by a car dealer. The trial court held that the bank's security interests were prior and ordered the vehicles released to the bank. The credit company appeals.

Heritage Ford Lincoln Mercury, Inc., (Dealer) of El Dorado, Kansas, was in the business of selling new cars. On February 18, 1981, it quit business. On February 24, 1981, it voluntarily surrendered its entire new car inventory to the credit company. Vehicle 1 and Vehicle 2 were on the new car lot and were listed in the documents when the cars were surrendered to the credit company.

Ford Motor Credit Company (Credit Company) had entered into an agreement with the Dealer in April, 1978, extending a

continuing line of credit by which the Dealer purchased vehicles from the manufacturer. This inventory financing is generally called a floor plan, and under such a plan a car dealer gives a credit company a purchase money security interest in all motor vehicles then owned and thereafter acquired, and in all proceeds from the sale thereof. This was done in the present case. The Credit Company also filed a financing statement with the Secretary of State on May 11, 1978, giving notice that it held a security interest in all new and used motor vehicles held by the Dealer, and in the proceeds.

This floor plan agreement provides:

"5. **Dealer's Possession and Sale of Merchandise**
"Dealer's possession of the merchandise financed hereunder shall be for the sole purpose of storing and exhibiting the same for sale or lease *in the ordinary course of Dealer's business*. Dealer shall keep such merchandise brand new and subject to inspection by Ford Credit and free from all taxes, liens and encumbrances. . . . Dealer shall not mortgage, pledge or loan any of such merchandise, and shall not transfer or otherwise dispose of the same except by sale or lease *in the ordinary course of Dealer's business*. . . . As used in this paragraph 5, '*sale in the ordinary course of Dealer's business*' *shall include only (i) a bona fide retail sale to a purchaser for his own use at the fair market value* of the merchandise sold, and (ii) an occasional sale of such merchandise to another dealer at a price not less than Dealer's cost of the merchandise sold, provided such sale is not a part of a plan or scheme to liquidate all or any portion of Dealer's business." Emphasis supplied.

Tom Overton was the president of the dealer corporation. Robert Magill was vice-president. Robert Ward is Robert Magill's father-in-law and he had invested upwards of $100,000.00 in the dealership. These three men were more or less active in the dealership and at times drove cars referred to in the business as demonstrators. The dealership was in financial trouble and it may be inferred that Overton and Magill decided to double finance certain new cars held under floor plan to raise operating cash for the business.

As to Vehicle 1, which was a new Lincoln Continental automobile, Tom Overton issued dealer papers to himself and obtained financing at First National Bank and Trust Company of El Dorado (Bank). Overton signed a note and security interest which were issued to and held by the Bank on this vehicle. Notice of security interest was sent in to the Division of Motor Vehicles. The loan proceeds were deposited directly in the dealer account at the Bank. The dealer's wholesale cost of the vehicle was

$18,992.27. The Bank loaned $17,992.27 on this vehicle. The retail value was $22,386.00. Overton paid no down payment. The vehicle was not personally licensed by Overton and it remained on the new car lot where it was available at all times for new car sale. The proceeds from this alleged sale were never paid to the Credit Company. The vehicle was on the premises and was turned over to the Credit Company when the Dealer went out of business in February, 1981. The Dealer had continued to carry insurance on the vehicle.

As to Vehicle 2, which was also a new Lincoln Continental automobile, Robert Magill issued dealer papers to himself and obtained financing at the Bank. Magill signed a note and security interest which were issued to and held by the Bank. The date of the alleged sale was February 3, 1981. This security interest was never perfected by filing. The loan proceeds were deposited in the Dealer account in the Bank. The Dealer's wholesale cost of Vehicle 2 was $15,394.62. The Bank loaned $15,394.62 on the vehicle. The retail value was $18,052.00. Magill made no down payment and the Credit Company was never paid the proceeds. The car was not licensed in Magill's name. It remained on the Dealer's new car lot where it was available for new car sale until the Dealer went out of business and turned it over to the Credit Company in February, 1981. The Dealer had continued to carry insurance on the vehicle.

When the dealership closed its doors and turned over the cars to the Credit Company, the Bank immediately filed suit to prevent the removal of these cars from the Dealer's premises and to establish a prior claim thereto. During the course of this action the trial court ordered the three vehicles delivered to the Bank and the Bank sold them and now holds the proceeds. We will set forth additional facts as to Vehicle 3 later in this opinion since the facts and applicable law are dissimilar.

We turn now to the Uniform Commercial Code, K.S.A. 1981 Supp. 84-9-312 relating to priorities among conflicting security interests in the same collateral. Section 84-9-312(3) provides:

"A perfected purchase money security interest in inventory has priority over a conflicting security interest in the same inventory and also has priority in identifiable cash proceeds received on or before the delivery of the inventory to a buyer if

"(a) the purchase money security interest is perfected at the time the debtor receives possession of the inventory."

Then follows subparagraphs (*b*) (*c*) and (*d*) as to notice which provisions of the statute are not pertinent to our discussion.

The Credit Company's purchase money security interest in inventory was perfected by filing with the Secretary of State and under the above section is to receive top priority, subject, however, to the rights of certain purchasers in particular sales which are made in ordinary course of Dealer's business and thus are contemplated by the parties in the floor plan agreement. Credit Company held a purchase money security interest within the definition appearing in K.S.A. 84-9-107(*b*):

"A security interest is a 'purchase money security interest' to the extent that it is

. . . .

"(*b*) taken by a person who by making advances or incurring an obligation gives value to enable the debtor to acquire rights in or the use of collateral if such value is in fact so used."

Credit Company paid the manufacturer the Dealer's wholesale cost of these cars when they were first delivered to the Dealer.

Both the floor plan agreement and K.S.A. 1981 Supp. 84-9-307 recognize that a buyer in ordinary course of business will take free of a security interest created by the seller-dealer. K.S.A. 1981 Supp. 84-9-307 provides:

"(1)   A buyer in ordinary course of business (subsection (9) of section 84-1-201) other than a person buying farm products   .   .   .   takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence."

A buyer in the ordinary course of business is defined in K.S.A. 1981 Supp. 84-1-201(9) as follows:

" 'Buyer in ordinary course of business' means a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind but does not include a pawnbroker."

In the Official Comment 2 under 84-9-307 it is suggested that by reading 84-9-307 and 84-1-201(9) together, "it results that the buyer takes free if he merely knows that there is a security interest which covers the goods but takes subject if he knows, in addition, that the sale is in violation of some term in the security agreement not waived by the words or conduct of the secured party."

There can be no question in the present case that both Overton and Magill, who were officers in the Dealer corporation, arranged

these sham sales in violation of the terms of the floor plan security agreement. There can be little doubt, Overton and Magill were not buyers in ordinary course of business under the above definition. They did not obtain licenses on these cars for personal use and they placed these vehicles on the new car lot where the cars were displayed for sale. These vehicles remained there until the business of the Dealer was closed down. The vehicles were not sold for fair market value as required by the floor plan agreement.

Even Robert Saferite, vice-president of the Bank, by his own testimony, was aware that these cars were not being sold in ordinary course of business. Under questioning by defendant's lawyer he testified:

"Q. All right. On any of the vehicles did you actually ever go through the steps of obtaining a title on any of the vehicles?

"A. No sir, I did not.

"Q. Those vehicles then were used in a short term, is that a correct assumption?

"A. Yes sir.

"Q. And then would be sold?

"A. Yes sir.

"THE COURT: I am curious. Were you using them as demonstrators or what —I don't understand?

"MR. SAFERITE: They would be used either one—either personal or for demonstrator purposes.

"Q. (By Mr. Hargrove) About how long did Overton or Magill keep one of the vehicles before they paid off their notes?

"A. It varied from a few days to several months."

We wish to emphasize that in this case the Bank is not a buyer, it is a financier of the alleged buyers, and although section 84-9-307(1) would allow a buyer in ordinary course to take free of Credit Company's security interest in the inventory, the Bank has no such rights for it is the financier, not a buyer. See Clark, The Law of Secured Transactions Under the Uniform Commercial Code § 3.4[3] n. 55 (1980).

The case cited by plaintiff Bank in support of the trial court's judgment establishing priority, has been considered by this court and is not persuasive as to plaintiff's claim.

Plaintiff Bank attempts to distinguish the case of *Borg-Warner Acceptance Corp. v. Atlantic Bank,* 364 So.2d 35 (Fla. Dist. Ct. App. 1978). We find it supports a holding in favor of the floor planner Credit Company in this case. In the *Borg-Warner* case Borg-Warner was the floor planner and perfected the security

interest which eventually covered the motor home in question. A dealer named Hill's World held the motor home in inventory. Hill's World then obtained a bank loan from Atlantic Bank. Title certificate was issued by the Department of Motor Vehicles showing Hill's World as owner and Atlantic Bank as lien holder. As to priority of liens between Borg-Warner, the floor planner, and Atlantic Bank, the Florida court determined that since there was no sale to a buyer in the ordinary course of business, judgment should be entered in favor of the floor planner Borg-Warner.

A security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds. K.S.A. 1981 Supp. 84-9-306(2). Under the Official Comment 3 following this section of the statute it is stated:

"In most cases when a debtor makes an unauthorized disposition of collateral, the security interest, under prior law and under this Article, continues in the original collateral in the hands of the purchaser or other transferee. That is to say, since the transferee takes subject to the security interest, the secured party may repossess the collateral from him or in an appropriate case maintain an action for conversion. Subsection (2) codifies this rule. The secured party may claim both proceeds and collateral, but may of course have only one satisfaction."

In the context of the present case the trial court erred in holding the sales of Vehicle 1 and Vehicle 2 were in ordinary course of business. The floor plan security interest continued in those two vehicles and in the proceeds. The trial court wrongfully permitted plaintiff Bank to take possession and to sell the same. On remand, the trial court is directed to determine the amount of proceeds received by the Bank from the sale of these vehicles and enter judgment in favor of defendant for such amounts, together with interest from the date the Bank sold these vehicles.

Now turning to Vehicle 3—a different procedure was followed by the Dealer in the case of Vehicle 3. On the surface this vehicle was sold to Robert Ward for $23,561.19. This appeared to be a Dealer-financed sale with the installment sale paper bearing the name, if not the signature, of Robert Ward. The Dealer then discounted the installment sale paper to the Bank for which the Bank paid $17,489.86. This represented a discount on the paper of several thousand dollars. A certificate of title in the name of Robert Ward was issued by the Department of Motor Vehicles

showing a lien in favor of the Bank. However, during the trial questions were raised concerning the regularity of this sale. There was testimony that Ward never possessed, never had custody, and never operated this vehicle. Although the vehicle was not located on the Dealer's new car lot when the inventory of new cars was audited by Credit Company, later the car was voluntarily delivered to the Bank by Magill and Ward after the Bank's court action had been on file against Credit Company for some time.

There was testimony by an officer of the Credit Company that he was familiar with the signature of Robert Ward and the signature on the installment sale contract was not that of Robert Ward. The home address of Robert Ward was Chanute, Kansas, but the address listed on the installment sale contract for Robert Ward was that of the dealership in El Dorado, Kansas. The identification number for the car as listed on the installment paper omitted the last two figures from the actual identification number of the car. This vehicle was surrendered to the Bank February 28, 1981, before the first payment on the installment paper fell due. The trial court made no findings of fact on which it based its final conclusion that the Bank held a prior security interest in the vehicle by reason of its purchase of the installment sale contract.

K.S.A. 1981 Supp. 84-9-308 provides:

"A purchaser of chattel paper or an instrument who gives new value and takes possession of it in the ordinary course of his business has priority over a security interest in the chattel paper or instrument

"(a) which is perfected under section 84-9-304 (permissive filing and temporary perfection) or under section 84-9-306 (perfection as to proceeds) if he acts without knowledge that the specific paper or instrument is subject to a security interest; or

"(b) which is claimed merely as proceeds of inventory subject to a security interest (section 84-9-306) even though he knows that the specific paper or instrument is subject to the security interest."

K.S.A. 1981 Supp. 84-9-105(b) states:

" 'Chattel paper' means a writing or writings which evidence both a monetary obligation and a security interest in or a lease of specific goods."

K.S.A. 84-1-103 states:

"Unless displaced by the particular provisions of this act, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions."

In regard to the formal requisites and validity of security interests, K.S.A. 1981 Supp. 84-9-203(1) more specifically provides:

"[A] security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless

"(a) the collateral is in the possession of the secured party pursuant to agreement, or *the debtor has signed a security agreement* which contains a description of the collateral  .  .  .  and

"(b) value has been given; and

"(c) the debtor has rights in the collateral." Emphasis supplied.

This latter statute points out that in order for a security agreement to be enforceable it must be signed by the debtor. In the present case there was testimony that the signature on the installment contract was not that of Robert Ward. The trial court made no findings. The evidence would seem to support findings that Vehicle 3 was not sold to Robert Ward in ordinary course of Dealer's business. In addition the evidence would seem to support a finding that the installment contract was not signed by the purported debtor Robert Ward. This court is not at liberty to arrive at its own findings of fact except in case of uncontroverted evidence. The statute K.S.A. 60-252(a) provides that in all actions tried upon the facts without a jury, the judge shall find, and either orally or in writing state the controlling facts. He did not do so in this case.

In addition to the lack of findings we note that the trial court erred in refusing to grant defendant time to complete discovery of relevant evidence as to the circumstances surrounding the alleged sale and the alleged execution of the chattel paper on Vehicle 3.

Defendant did not learn of the fact that Vehicle 3 had been returned to the Bank until on or about March 30. Trial was had as to Vehicle 3 on April 15, 1981, over the objection of defendant who argued to the court that prior efforts to discover dealership records had been frustrated and service of process on Overton and Magill had not been successful. Defendant requested a continuance to make further discovery but the request was denied.

To show the prejudice which resulted from this refusal to allow time to complete discovery and take the depositions of Tom Overton and Robert Magill, defendant sets forth in the reply brief certain testimony of Robert Magill obtained in a subsequent federal proceeding. Magill testified under oath that he knew his

father-in-law's signature when he saw it; that the name Robert Ward affixed to the installment contract covering Vehicle 3 was not Robert Ward's signature; that it appeared to be a signature that he, Robert Magill, put on the instrument. Magill further testified that Mr. Ward was not buying Vehicle 3 and that it was a method used to raise needed cash for the dealership. Magill further stated that Mr. Saferite, vice-president of the Bank, was aware of the purpose of this financing and that it was to raise cash and was not a personal purchase of the car by Robert Ward.

We do not consider this testimony of Robert Magill as any part of the evidence in the case before us, except for the purpose of supporting defendant's claim of prejudice from the refusal of the trial court to permit a continuance.

The pleading which brought Vehicle 3 into issue in this case was filed March 31. The trial of this issue was set for April 15, over the objection of defendant. Under the circumstances, the trial court abused its discretion in requiring a trial on the issues 15 days after the issues were joined and before discovery had been completed. The judgment as to Vehicle 3 is reversed and the issues raised by the counterclaim and answer to counterclaim both filed on March 31, should be fully retried on remand.

In summary, the judgment of the district court as to Vehicles 1 and 2 is reversed and the court is directed to enter judgment against the First National Bank and Trust Company of El Dorado, Kansas, and in favor of the Ford Motor Credit Company for the amounts received by the Bank on the sales of these two vehicles plus interest and costs. The judgment of the district court as to Vehicle 3 is reversed and the case is remanded with directions to grant a new trial on the issues joined by the counterclaim and the answer to the counterclaim.