**TEXAS NATIONAL BANK OF HOUSTON, Plaintiff,**

v.

**Calvin AUFDERHEIDE and John McCauley, dba A & M Flying Service, and De Witt Bank & Trust Company, Defendants.**

**No. PB-63-C-34.**

United States District Court
E. D. Arkansas,
Pine Bluff Division.

Nov. 19, 1964.

Guy Amsler, Jr., of Barber, Henry, Thurman & McCaskill, Little Rock, Ark., for plaintiff.

Griffin Smith, Little Rock, Ark., and Wilbur Botts, De Witt, Ark., for defendants.

HENLEY, Chief Judge.

This controversy arises out of a 1963 sale by a Texas retail aircraft dealer to the individual defendants, citizens of Arkansas, of a certain Piper PA 25–235 airplane which at the time of the sale was subject to a floor plan mortgage in favor of plaintiff, Texas National Bank of Houston, which mortgage had been duly recorded with the office of the Federal Aviation Agency in Oklahoma City, pursuant to the provisions of section 503 of the Federal Aviation Act of 1958, 49 U.S.C.A. § 1403. On February 20, 1963, the plane was sold at Houston to the individual defendants by Cummings & Groves, Inc., hereinafter sometimes called Groves, a franchised retail dealer in Piper Aircraft. The purchasers of the plane paid the dealer the purchase price thereof, but the dealer failed to discharge the lien of the Bank. This suit was filed when the Bank was unable to collect its debt from the dealer and was unable to get the plane back from the purchasers. The cause has been submitted to the Court upon the pleadings, a stipulation of facts, the discovery deposition of one of plaintiff's vice presidents, and briefs of counsel in the form of letters to the Court.

Plaintiff is a national banking institution domiciled in Texas, and having its principal place of business in the City of Houston in that State. As indicated, the individual defendants, who are partners doing business as A & M Flying Service, and who are hereinafter referred to as A & M, are citizens of Arkansas. The corporate defendant, De Witt Bank & Trust Company, is an Arkansas state bank having its principal place of business in De Witt, Arkansas County, Arkansas. This defendant holds a mortgage on the aircraft in question which was executed by A & M contemporaneously or practically contemporaneously with its original acquisition of the plane and which was recorded with

the Federal Aviation Agency in May 1963, apparently after the controversy arose. Measured by the relief demanded by plaintiff, the Court is able to find and does find that the amount in controversy is in excess of $10,000, exclusive of interest and costs.

The record discloses that Groves did business in Houston between 1959 and 1963 and during that period was floor planning with plaintiff Bank aircraft purchased by Groves from the manufacturer. The arrangement between Groves and the Bank was that the latter would advance to the former 90 percent of the manufacturer's sales price of each aircraft acquired by Groves for the purpose of resale; the remaining 10 percent of such price was supplied by Groves itself. When the Bank would make a loan to Groves in order to permit it to acquire a new airplane, Groves would execute in favor of the Bank a 60-day note for the amount of the advance and would also execute and deliver to the Bank a chattel mortgage covering the plane. That mortgage would be recorded by the Bank with the County Clerk of Harris County, Texas, and would also be recorded with the office of the Federal Aviation Agency at Oklahoma City, Oklahoma, as required by the federal statute which has been mentioned, as implemented by regulations appearing in 14 C.F.R., Part 503, §§ 503.1 et seq.

Normally, when Groves would sell a plane to a customer such as A & M, it would satisfy the claim of the Bank against the plane, the Bank would give Groves a release of the mortgage, and Groves would mail that release to the purchaser.

Groves acquired the plane in question from the manufacturer on or prior to December 28, 1962, and in accordance with the floor planning arrangement the Bank advanced Groves the sum of $10,000. On the date just mentioned Groves executed and delivered to the Bank a note for $10,000, payable 60 days from date and bearing six percent interest, together with the chattel morgage in suit, which mortgage the Bank, according to its custom, filed for record in Harris County and with the Federal Aviation Agency at Oklahoma City. The filing date of the mortgage in Oklahoma City was January 4, 1963.

When A & M bought the plane, it paid therefor with a check for $12,500 drawn on the De Witt Bank & Trust Company. The face of the check indicated that it had been drawn in payment of the purchase price of the particular aircraft involved in this case. Groves endorsed this check for deposit and deposited it with the Bank. Groves did not direct that the proceeds of the check be applied so as to extinguish the obligation to the Bank with respect to such plane, and no such application was made. The proceeds of the check were simply credited to the general checking account of Groves. Upon completion of the purchase A & M assumed possession of the plane, caused it to be flown to Arkansas and put it into service in connection with the business of A & M, which is that of operating a commercial agricultural aviation service.

It has been stipulated that none of the defendants made any search of the records of the Federal Aviation Agency at Oklahoma City or of the records of Harris County, Texas, in connection with the purchase of the plane, but it has been stipulated also that none of the defendants had any actual knowledge or notice of the lien of the Bank.

Although the Bank's mortgage in terms prohibited a sale or removal of the plane by Groves without the written consent of the Bank, the Court finds from the materials before it that the transaction which gave rise to this lawsuit was handled by Groves in its usual and customary manner, the only difference being that in this instance Groves did not pay off the Bank after selling the plane. The plane was permitted to remain in the possession of Groves as part of its stock in trade and was exposed and advertised for sale in the regular course of business. It is clear that the Bank knew that Groves was selling aircraft covered by floor plan mortgages in favor of the Bank and was settling with the Bank

after sales were made. According to the deposition which has been mentioned the Bank had financed Groves in connection with the acquisition of from 50 to 75 aircraft prior to making Groves an advance in connection with the instant plane.

The evidence reflects that it was the custom of the Bank to make more or less periodic checks of the inventory of Groves. In the course of one of those inspections, which was made in March 1963, representatives of the Bank discovered that this particular plane was missing and investigation revealed that Groves had sold the plane to A & M and had not satisfied the Bank's claim.

It is the position of the Bank that since its mortgage was duly recorded with the Federal Aviation Agency prior to the time when A & M purchased the plane from Groves, the lien of the Bank, by virtue of 49 U.S.C.A. § 1403, is a valid lien and is superior to the claims and interests of the defendants, including the De Witt Bank & Trust Co.

In opposition to the Bank's claim the defendants advance two contentions. They contend, first, that the validity of the mortgages against them is not governed by the federal statute, but by article 4000 of Vernon's Annotated Civil Statutes of Texas,[1] and that as to them the mortgage is void since the aircraft was left in the possession of Groves as part of its stock in trade for the purpose of sale, and that it was sold at retail by Groves in the regular course of business and was purchased in good faith by A & M. Defendants contend, alternatively, that in any event the Bank waived its lien on the plane when it accepted Groves's deposit of A & M's check and credited it to the former's account without taking steps to satisfy its own security interest.

In countering the contentions advanced by defendants the Bank argues in its letter briefs that even if the rights of the parties are not governed by the federal statute on which it relies, nevertheless the mortgage in suit does not fall within the terms of Article 4000 of the Texas Statutes, and the Bank denies that its conduct with respect to the handling of A & M's check constituted any waiver of its mortgage lien.

I.

As stated, 49 U.S.C.A. § 1403, upon which plaintiff relies primarily, is section 503 of the Federal Aviation Act of 1958; corresponding provisions appeared in the earlier Civil Aeronautics Act of 1938. Section 1403 and the regulations just mentioned set up a system for the recording at a central point, Oklahoma City, of all conveyances and other instruments, including mortgages, affecting title to commercial aircraft in this country. They also prescribe in general the form which such instruments are to take and the formality with which they are to be executed.

Section 1403(c) provides in general that in the absence of a proper recording, as prescribed by the Act and regulations, no conveyance or mortgage affecting the title to an airplane is valid, except as between the original parties or with respect to third persons having actual notice of the conveyance or lien. And section 1403(d), insofar as here pertinent, provides that when such conveyance or instrument is filed and recorded under the Act, it shall "from the time of its filing for recordation be valid as to all persons without further or other recordation  *  *  *."

---

1. That section of the Texas statutes is as follows: "Every mortgage, deed of trust, or other form of lien attempted to be given by the owner of any stock of goods, wares or merchandise daily exposed to sale, in parcels, in the regular course of business of such merchandise, and contemplating a continuance of the possession of said goods by said owner, shall be deemed fraudulent and void; provided that this Article shall not apply to farm products when offered for sale by the producer; and further provided that this Article shall not apply to any mortgage, deed or trust or other form of lien given to secure the purchase price of any such goods, wares or merchandise, except as to all retail sales made in good faith in the regular course of business."

■ There is no question that the Congress by the statutory enactments which have been mentioned has preempted the field of registration and recording of title instruments affecting commercial aircraft, Pacific Financial Corporaton v. Central Bank & Trust Co., 5 Cir., 296 F.2d 68, 71, so that protection is no longer afforded to a purchaser or mortgagee of such an aircraft by a recording of his conveyance or mortgage under a State recording statute.

■ On the other hand, compliance with section 1403 does not validate a conveyance or other instrument which is lacking in initial or inherent validity as a contract document between the original parties, as, for example, a mortgage or conveyance obtained by fraud or without consideration, or executed by an incompetent party. Questions of such inherent or original validity must be determined by reference to applicable State law. This has been expressly recognized by the Congress. See in this connection the Act of June 30, 1964, P.L. 88–346, 78 Stat. 236, which statute, among other things, provides that the validity of a conveyance or other instrument affecting an aircraft is to be determined by the law of the place where the instrument is delivered. In the Court's estimation the validity about which Congress was talking in the 1964 Act is what the Court has referred to as the initial or inherent validity of the instrument in question.

■ While the act of recording a conveyance or mortgage under the terms of the federal statute or any other recording statute does not confer inherent validity upon an instrument otherwise basically invalid, proper recordation can, and usually does, have a substantial bearing on the validity of the instrument as to third persons, and as to the priority to be accorded to that instrument with respect to other claims or liens affecting the property involved whether arising before or after the recordation.

■ The right of Congress to legislate in the field of registration of aircraft and to provide for the recordation of liens upon or conveyances of such craft is not questioned; and the validity as to third persons of conveyances or instruments affecting the title to aircraft, and the relative rights of claimants to such aircraft, to the extent that such rights are dependent upon the fact or time of recordation of conveyances or other instruments, are matters which are governed by the federal statute rather than by local law. See United States v. United Aircraft Corporation, D.C.Conn., 80 F.Supp. 52; In re Veterans' Air Express, Inc., D.C.N.J., 76 F.Supp. 684; Continental Radio Company v. Continental Bank & Trust Co., Tex.Civ.App., 369 S.W.2d 359; Blalock v. Brown, 78 Ga. App. 537, 51 S.E.2d 610, 9 A.L.R.2d 476.

II.

■ It does not follow, however, that section 1403 has repealed or abolished the general rule of chattel mortgage law that when a mortgagee consents to the sale of a mortgaged chattel free of lien by the mortgagor, the purchaser takes free of the mortgage lien and his rights are superior to those of the mortgagee. 15 Am.Jur.2d, Chattel Mortgages, §§ 150, 151, and 153; 14 C. J.S. Chattel Mortgages § 262. And a provision in a chattel mortgage prohibiting a sale of the mortgaged chattel without the mortgagee's consent is waived if the mortgagee knowingly permits the violation of such provision. 15 Am. Jur.2d, p. 324.

In 14 C.J.S., Chattel Mortgages § 262 b, pp. 878–879, it is said that a mortgagee's consent to a sale by the mortgagor of the property may be implied or inferred from the conduct of or the dealings between the parties. It is also said: "In the absence of a stipulation to the contrary, consent to sell mortgaged property consisting of a stock of goods is implied from the fact that the mortgagor is permitted by a provision in the mortgage to remain in possession of the property, or from the fact that the mortgagee accepted a mortgage on such property and permitted the mortgagor to remain in possession thereof with knowledge

that it would be exposed and offered for sale by the mortgagor in the ordinary course of trade." (14 C.J.S. at 879–880.)

The Court holds that the general rule mentioned above has not been repealed or eliminated by section 1403, and that said rule is applicable to the facts of this case.

■ As has been observed, the Bank and Groves had been dealing with each other since 1959, and there is nothing to indicate that there was anything peculiar about the Bank's arrangements with Groves as far as the instant aircraft is concerned, nor does the record suggest that the note and mortgage covering this transaction differed in any material respects from the notes and mortgages executed by Groves in connection with the floor planning of other aircraft. Aircraft floor planned by Groves with the Bank were permitted to remain in the possession of Groves, and the Bank knew of and acquiesced in the practice of Groves of selling such aircraft in the normal course of business and then settling with the Bank. Monies received by Groves were deposited to its general account and became subject to the checks of Groves. In such circumstances the Court finds that Groves had at least the implied consent of the Bank to sell the plane in question notwithstanding the prohibition contained in the mortgage, and that the Bank now has no lien on the plane as against the individual defendants or as against the De Witt bank.

Ordinarily, when a person goes into a merchant's place of business to make a purchase, whether it be of an automobile, a television set, a washing machine, or a pound of nails, the purchaser ought to have the right to assume that the merchant has a right to sell the commodity in question and should not be required to make a record search before purchasing or to see to it that the merchant obtains a valid release of the item from a bank floor plan before delivering it to the purchaser and receiving his money or obligation. The Court sees no reason why that right should not extend to the purchaser of an airplane who buys it from a recognized dealer from a regular inventory or display and in the ordinary course of business.

■ The conclusion here reached does not in the Court's estimation conflict with the law or public policy of Texas, as expressed in Article 4000 and in numerous Texas cases which might be cited. But, the Court does not base its conclusion here on any common or statutory law of Texas, as such. Rather, the Court rests its determination on a general, and the Court thinks salutary, principle of law which in the Court's opinion should be given recognition in applying section 1403. Cf. Textile Workers Union v. Lincoln Mills of Alabama, 353 U.S. 448, 456, 77 S.Ct. 912, 1 L.Ed.2d 972; Bank of America National Trust & Savings Ass'n v. Parnell, 352 U.S. 29, 77 S.Ct. 119, 1 L.Ed.2d 93.

In this connection the Court calls attention to the fact that the view here taken is consistent with that expressed in section 9–307 of the Uniform Commercial Code which provides that a buyer in the ordinary course of business, other than a person buying farm products from a farmer, takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence. While Texas does not appear to have adopted the Code, it has been adopted in Arkansas and in a number of other States. See Title 85 of the Annotated Statutes of Arkansas; see also the Am. Jur.2d Desk Book, Document 130 for a list of States which have adopted the Code.

### III.

What has been said up to this point is dispositive of the case, but in the interest of completeness the Court will comment to some extent on defendant's alternative contention based upon the Bank's handling of A & M's check. The Court does not find that the validity of that contention has been established in this case.

■ The Court recognizes at the outset that in certain circumstances a mortgagee may by his conduct after an unauthorized sale of a mortgaged chattel by the mortgagor be held to have waived his lien or may be estopped from asserting it. And that principle is as applicable to a bank as it is to any other mortgagee.

■ If a mortgagee knowingly receives and retains the proceeds of a sale of mortgaged property, his conduct amounts to a waiver of his lien with respect to the property which was the subject of the sale. And the Court is prepared to concede, at least *arguendo*, that if a responsible officer or employee of a bank knows or is charged with knowledge that mortgaged property has been sold and that the proceeds of the sale have been or are about to be deposited to the account of the mortgagor so as to be subject to his withdrawal and that the mortgagor will probably be unable to discharge the lien if the proceeds of the deposit are dissipated, the bank may owe some duty to the purchaser to take steps to sequester the deposit. Certainly, ordinary prudence would prompt the bank to take such action for its own protection, regardless of any duty on its part to protect the purchaser.

The record here, however, does not establish the existence of either of the situations just outlined. Apart from such inferences as may be drawn from the bare fact that the Bank is a national bank doing business in Houston, Texas, which would indicate that it is a financial institution of some size in a large city, the Court knows nothing about the operation of the Bank or about the simplicity or complexity of its organization; nor does the Court have any detailed information as to who actually handled the A & M check, or as to the circumstances in which it was handled, or as to the status of Groves's account either in general or as of the time when the deposit was made. All that the record establishes is that the check, with the notation which has been described, was deposited in a routine manner, presumably being received at a teller's cage, that the bookkeeping department in a routine manner credited the account of Groves with the proceeds of the check, and that this was done a few days prior to the due date of the note executed in the Bank's favor.

Although the defendants argue that the Bank received the proceeds of the sale of the aircraft, such was not the case. As stated, the Bank did receive the check for deposit, but the proceeds of the check were credited to the account of Groves, and the Bank derived no benefit from them as far as the discharge of its lien was concerned. Groves did not direct the Bank to apply the proceeds of the check to the satisfaction of the lien, and the Court cannot say that the mere notation on the check was a directive by A & M to the Bank as to the application of the check's proceeds. That notation appears to the Court to have been nothing more than an identification of the transaction so that the check would serve as a receipt should a subsequent controversy arise between A & M and Groves.

■ On this phase of the case the burden was upon the defendants to establish by a preponderance of the evidence that the conduct of the Bank subsequent to the sale of the plane and in connection with the A & M check amounted to a waiver or estoppel, and defendants have failed to discharge that burden.

However, since the Court has concluded that A & M took the plane in the first instance free and clear of the Bank's lien, defendants' failure to establish a subsequent waiver or estoppel is not material.

A judgment dismissing the complaint will be entered.