WISDOM, Circuit Judge:
 

 I.
 

 This dispute over the ownership of one airplane and of the proceeds of the sale of another requires us to determine the reach of the Federal Aviation Act and its impact on state law. We also explore the protection accorded buyers against secured creditors by state law.
 

 In December 1971, Gary Aircraft Corporation (“Gary”), the plaintiff-appellee, entered into a letter of understanding stating its intention to purchase four airplanes from Frederick B. Ayer & Associates, Inc. (“Ayer”), a dealer in aircraft. Two of these airplanes are the subject of the controversy here. Gary did not complete the purchase, but Arthur Stewart, its president, carried out the transaction in his individual capacity, purchasing the first plane in controversy here, N8222H, on December 22, 1971 for $5,000, and the second, N8221H, on January 4.1972, also for $5,000. On the date of each sale, the airplane purchased was subject to a security interest held by General Dynamics Corporation (“General Dynamics”), the defendant-appellant. General Dynamics held its interest under a security agreement executed by Ayer on February 20, 1969. Under that agreement, Ayer was authorized to sell the collateral, unless it was in default on its obligations to General Dynamics. In case of default, Ayer could not sell without the written consent of General Dynamics. General Dynamics recorded its security agreement with the Federal Aviation Administration on March 3, 1969. On the dates of the sales to Stewart, Ayer was in default.
 
 [1]
 

 Crawford, the vice-president of Gary, requested a title search from the Aircraft Owners and Pilots Association on January 4.1972. The AOPA reported the results on January 5, 1972. On August 3, 1972, approximately seven months after the sale, Stewart recorded his bill of sale with the FAA. Over the next four years, Crawford communicated periodically with Ayer, requesting that Ayer take action to secure the release of General Dynamics’s security interest.
 

 In March 1974, Stewart sold one of the group of four planes to Gary for $13,275. He transferred the two planes at issue here to Gary on November 7, 1975, apparently without consideration. Gary executed a mortgage on the aircraft in favor of the Victoria Bank and Trust Company, the third party defendant. The Victoria Bank recorded its interest with the FAA. On May 28, 1976, General Dynamics informed Gary that it had learned that the aircraft were registered in Gary’s name and that General Dynamics was asserting a security interest in the property.
 

 On October 28,1976, Gary initiated Chapter XI proceedings under the Bankruptcy Act. It brought this action in the bank
 
 *368
 
 ruptcy court, seeking to sell Airplane N8222H free and clear of liens. Upon the agreement of all interested parties, the comet permitted the sale of the airplane, and the proceeds were deposited with the court. The second airplane remains in the possession of Gary.
 

 The bankruptcy court, affirmed by the district court, held that Gary was entitled to the proceeds of the sale of Airplane N8222H and to the possession of Airplane N8221H, free of any interest asserted by General Dynamics. General Dynamics appeals, presenting three theories. First, it contends that the Federal Aviation Act grants it priority because it recorded its security interest with the Federal Aviation Administration before Stewart purchased the aircraft. Second, even if the FAA does not govern the priority question but instead remits it to Texas law, which protects a buyer in the ordinary course of business against the perfected security interest of his seller’s creditor, General Dynamics argues that Stewart could not take free of its interest because, according to General Dynamics, Stewart could not qualify as a buyer in the ordinary course of business. Finally, General Dynamics contends that, even if Stewart did qualify as a buyer in the ordinary course, he could not transfer his status to Gary, and Gary did not qualify in its own right so, in Gary’s hands, the aircraft are subject to the interest of General Dynamics. Concluding that the FAA does not govern priorities in interests in aircraft, that Stewart, as a buyer in the ordinary course of business, took free of General Dynamics’s interest, and that Gary takes the title of its transferor, we affirm.
 

 II.
 

 General Dynamics’s first theory presents this court, for the first time, with the question to what extent the provisions of the Federal Aviation Act, 49 U.S.C. §§ 1301-1542, preempt state regulation of interests in aircraft. The Civil Aeronautics Act of 1938, and its successor, the Federal Aviation Act of 1958, both create a single national recording system for interests in aircraft. Section 503 of the FAA, 49 U.S.C. § 1403, establishes the recording system and provides,
 

 (c) No conveyance or instrument the recording of which is provided for by subsection (a) of this section shall be valid in respect of such aircraft . .. against any person other than the person by whom the conveyance or other instrument is made or given, his heir or devisee, or any person having actual notice thereof, until such conveyance or other instrument is filed for recordation....
 

 (d) Each conveyance or other instrument recorded by means of or under the system provided for in subsection (a) or (b) of this section shall from the time of its filing for recordation be valid as to all persons without further or other recordation.
 
 [2]
 

 In 1964, Congress added section 506, 49 U.S.C. § 1406, providing,
 

 The validity of any instrument the recording of which is provided for by section 1403 of this title shall be governed by the laws of the State, District of Columbia, or territory or possession of the United States in which such instrument is delivered. . . .
 

 Without question, section 506 reserves some areas of regulation for the states by assigning questions of “validity” to state law. At the same time, Congress has provided the exclusive means of recordation and has preempted state laws providing filing systems for interests in aircraft.
 
 See, e.g., Bank of Lexington v. Jack Adams Aircraft Sales, Inc.,
 
 5 Cir. 1978, 570 F.2d 1220 (dictum); Scott,
 
 Liens in Aircraft: Priorities,
 
 25 J.Air L. & Com. 193, 200 (1958).
 

 Whether Congress intended to preempt a broader field of state law by federalizing also the assignment of priorities to
 
 *369
 
 various interests in aircraft is not as clear. The courts have split on that question.
 
 Compare, e.g., Sun Bank v. Snell (In re Cone),
 
 Bkrtcy.M.D.Fla.1981, 11 B.R. 925 (FAA preempts state priorities law);
 
 Dowell v. Beech Acceptance Corp.,
 
 1970, 3 Cal.3d 544, 476 P.2d 401, 91 Cal.Rptr. 1 (in banc) (same),
 
 cert. denied,
 
 1971, 404 U.S. 823, 92 S.Ct. 45, 30 L.Ed.2d 50;
 
 and O’Neill v. Barnett Bank,
 
 Fla.App.1978, 360 So.2d 150 (same)
 
 with, e.g., Danning v. World Airways, Inc. (In re Holiday Airlines),
 
 9 Cir.1981, 647 F.2d 977 (FAA does not preempt state priorities law),
 
 cert. denied,
 
 1982, - U.S. -, 102 S.Ct. 1009, 71 L.Ed.2d 299;
 
 Sanders v. M.D. Aircraft Sales, Inc.,
 
 3 Cir.1978, 575 F.2d 1086 (same);
 
 Bitzer-Croft Motors v. Pioneer Bank & Trust Co.,
 
 1980, 82 Ill.App.3d 1, 37 Ill.Dec. 247, 401 N.E.2d 1340 (same);
 
 and Southern Jersey Airways, Inc. v. National Bank,
 
 1970, 108 N.J.Super 369, 261 A.2d 399 (same). After considering the language of the FAA and the CAA as well as their legislative history, we conclude that the FAA does not displace state law assignment of priorities to interests in aircraft. That conclusion is in accord with the weight of recent authority,
 
 see
 
 cases cited above;
 
 CIM International v. United States,
 
 9 Cir.1980, 641 F.2d 671, 675 n.6;
 
 Danning v. Pacific Propeller, Inc. (In re Holiday Airlines Corp.),
 
 9 Cir.1980, 620 F.2d 731,
 
 cert. denied,
 
 449 U.S. 900, 101 S.Ct. 269, 66 L.Ed.2d 130;
 
 Haynes v. General Electric Credit Corp.,
 
 W.D.Va.1977, 432 F.Supp. 763;
 
 Industrial National Bank v. Butler Aviation International, Inc.,
 
 E.D.N.Y.1974, 370 F.Supp. 1012, 1016-17;
 
 Cessna Finance Corp. v. Skyways Enterprises, Inc.,
 
 Ky.1979, 580 S.W.2d 491.
 
 [3]
 
 A majority of the commentators agree.
 
 See
 
 1 G. Gilmore, Security Interests in Personal Property § 13.5 (1965); J. White & R. Summers, Uniform Commercial Code § 25-16 at 1077 (2d ed. 1980); Sigman,
 
 The Wild Blue Yonder: Interests in Aircraft Under Our Federal System,
 
 46 S.Cal.L.Rev. 316 (1973); Note,
 
 Taking the Lender for a Ride: Section 1403 of the Federal Aviation Act and the Buyer in the Ordinary Course of Business,
 
 36 Wash. & Lee L.Rev. 205 (1979); Note,
 
 Federal Protection of Security Interests in Carriers’ Mobile Equipment,
 
 71 Harv.L.Rev. 1516, 1530-31 (1958).
 

 Although Congress has acted in the general field of aircraft interests, the supremacy clause, U.S.Const. art. VI, requires us to invalidate
 
 [4]
 
 state law only if it
 
 *370
 
 conflicts with a federal statute, if it would frustrate a federal scheme, or if the totality of the circumstances shows that Congress sought to occupy the field. The intent of Congress is determinative.
 
 [5]
 

 Malone v. White Motor Corp.,
 
 1978, 435 U.S. 497, 504, 98 S.Ct. 1185, 1189, 55 L.Ed.2d 443, 450. The courts do not favor the preemption of state law, however, and, in the absence of strong reasons to believe that Congress intended to displace it, state law governs.
 
 Chicago and Northwestern Transportation Co. v. Kalo Brick & Tile Co.,
 
 1981, 450 U.S. 311, 315-316, 101 S.Ct. 1124, 1129, 67 L.Ed.2d 258, 264-65.
 

 Before examining the statute itself, we reject General Dynamics’s contention that it would be meaningless to create a central recording system without according priority to earlier recorded interests.
 
 [6]
 
 Refusing to grant priority to recorded interests over all others would make sense if Congress were attempting to deal with the problems created by the mobility of aircraft. Before the enactment of the CAA, to be certain of protecting his interest insofar as an interest in an airplane was protectible by recordation, the holder had to record in all states in which the aircraft might be located. Similarly, a subsequent creditor or purchaser had to undertake a title search in all states if he wished to be certain that no prior recorded interests existed. By creating a single federal recording system, Congress eliminated the need for multiple recordation and multiple title searches. If that were the only problem that Congress intended to resolve, it would not be necessary to address the question of priorities at all, for the establishment of a recording system does not compel any given set of priority rules. The Uniform Commercial Code is a case in point. Although it sets up a recording system for interests in personal property,
 
 see
 
 U.C.C. §§ 9-401 — 9-403 (1962), it also creates a priority system under which a recorded interest does not take precedence over all unrecorded interests or all interests recorded later,
 
 e.g., id.
 
 §§ 9-307(2), 9-310. These special priority rules further goals other than encouraging recordation, such as promoting the free alienability of goods by protecting good faith buyers from the interests of the creditors of their retailer-sellers. In enacting the CAA and the FAA, Congress could have intended to eliminate the problems inherent in local recordation of mobile property but to leave to the states the task of striking the balance between competing interests that dictates the effect that recordation of an interest will have on its priority.
 

 Looking to the statute itself, we find that the language is ambiguous. Subsections
 
 *371
 
 503(c) and (d) provide that no instrument shall be “valid” (except against the parties to the instrument and parties with actual knowledge) until filed and that, once filed with the Federal Aviation Administration, all instruments shall be “valid” without further recordation. But “validity” need not establish priority. On the contrary, it may mean nothing more than that recordation with the FAA will assure the instrument such “validity” as state law grants a recorded instrument. As the district court noted, if the term “valid” refers to enforceability, a literal interpretation of the language would lead to irrational results — one could create an enforceable interest in an aircraft without giving any value simply by recording it with the FAA.
 
 [7]
 
 Still, we could read the statute as giving “validity” in the sense of priority to recorded interests
 
 otherwise
 
 “valid” under state law — that is, “valid” in the sense of complying with formalities and requirements of consideration. Under that interpretation, the choice of law rule in section 506, which refers questions of “validity” to the law of the state where the instrument was delivered, would mean only that the law of that state governs these questions of formality and adequacy of consideration.
 

 The statute does undertake to assign some substantive priorities. For instance, it recognizes and provides for recordation of the “basket lien” — a lien over stocks of spare parts maintained for installation in aircraft, 49 U.S.C. § 1403(a)(3) — and provides that a recorded interest in a specific engine shall have priority over both previously and subsequently recorded basket liens. § 1403(d).
 
 See
 
 1 G. Gilmore, Security Interests in Personal Property § 13.5 (1965). But the treatment of this special lien, see
 
 id.,
 
 does not necessarily indicate that Congress was legislating a full set of priority rules to cover all interests. On the contrary, the use of specific language to cover this special case could just as readily suggest that Congress meant to leave other priority rules unchanged — that is, they are left to state law.
 
 [8]
 

 It is also instructive to compare the language and structure of the FAA with that of the Ship Mortgage Act, 46 U.S.C. §§ 911-984. In the SMA, Congress used language very similar to section 503 of the FAA, stating,
 

 (a) No sale, conveyance, or mortgage which, at the time such sale, conveyance, or mortgage is made, includes a vessel of the United States, or any portion thereof, as the whole or any part of the property sold, conveyed, or mortgaged shall be valid, in respect to such vessel, against any person other than the grantor or mortgagor, his heir or devisee, and a person having actual notice thereof, until such bill of sale, conveyance, or mortgage is recorded in the office of the collector of customs of the port of documentation of such vessel, as provided in subsection (1) of this section.
 

 46 U.S.C. § 921(a). Then, the Act defines the “preferred mortgage” as a mortgage on an entire vessel that meets certain other requirements.
 
 Id.,
 
 § 922. In section 953(b), the SMA specifies the priority accorded the preferred mortgage in a judicial sale: it prevails over all interests except costs allowed by the court and “preferred maritime liens” (defined as liens arising pri- or in time to the recording of the preferred mortgage), liens for tort damages, and liens
 
 *372
 
 for wages of a stevedore, § 953(a). Also, the preferred mortgage prevails over common law possessory liens, such as a mechanic’s lien. §§ 952, 953(b). If the language of section 921 sufficed to create a priority system, as General Dynamics urges that the similar language of the FAA does, it is difficult to see why Congress bothered to specify that preferred maritime liens prevailed over the preferred mortgage, for, if there is a priority system implicit in section 921,
 
 see
 
 note 6, it already gives the earlier interest priority. Similarly, it should have been unnecessary to grant the preferred mortgage priority over a possessory lien, for such unrecorded liens would not be enforceable against third parties if section 921 created a priority system.
 

 Thus, though Congress has not spoken with the pristine clarity desirable to a judiciary charged with the task of divining the meaning of some Delphic congressional enactments, our examination of the language of the FAA favors construing it as the creation of a central recording system and not as an attempt to assign priorities to competing interests in aircraft. The legislative history also supports that view.
 

 The history of the FAA itself provides no guidance, for Congress there simply re-enacted these provisions of the CAA without substantial change.
 
 See
 
 note 1. The history of the CAA, though, reflects the original consideration Congress gave to this legislation. Nowhere does it indicate an attempt to deal with the problem of priorities.
 
 See
 
 H.R.Rep.No.2254, 75th Cong., 3d Sess. (1938); S.Rep.No.1661, 75th Cong., 3d Sess. (1938); H.R.Rep.No.2635, 75th Cong., 3d Sess. (1938) (Conference Report).
 
 [9]
 
 In fact, the Senate version of the bill was amended to delete language that would have created substantive priority rules. 83 Cong.Rec. 6757 (1938). In sum, the legislative history suggests that the main concern of Congress was to create a central filing system, leaving the effect of filing to the states. Consequently, we conclude that the FAA does not preempt state law on priorities.
 
 [10]
 
 Our conclusion does not, however, resolve this case, for General Dynamics insists that it prevails even if Texas law governs the priority of interests.
 

 III.
 

 Under the Uniform Commercial Code, enacted as the Texas Business and Commerce Code, a buyer in the ordinary course of business is one who, in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party, buys from a person in the business of selling goods of that kind. Tex.Bus. & Com.Code Ann. § 1.201(9) (Vernon Supp.1982). Such a buyer takes free of a security interest created by his seller, even if that interest is perfected and even if the buyer knows of its existence.
 
 Id.,
 
 § 9.307(a).
 

 Since Gary claims its title through Stewart, it cannot hold the aircraft and the
 
 *373
 
 proceeds free of General Dynamics’s lien unless Stewart held the aircraft free of the lien, as a buyer in the ordinary course of business under section 9.307(a). General Dynamics offers three arguments that it contends require reversal of the holding that Stewart qualified as a buyer in the ordinary course of business.
 

 First, General Dynamics contends that the bankruptcy court misapplied the burden of proof. The burden on this issue does rest with the party claiming the status of a buyer in the ordinary course of business, as General Dynamics urges.
 
 See International Harvester Co. v. Glendenning,
 
 Tex.Civ.App.—Dallas 1974, 505 S.W.2d 320, 324. Nonetheless, General Dynamics cannot prevail on this argument, for we agree with the district court that an examination of the entire opinion of the bankruptcy court shows that it did not misapply the burden of proof.
 
 [11]
 
 General Dynamics’s contention to the contrary relies exclusively on one sentence in the opinion of the bankruptcy court: “The preponderance of the evidence simply does not establish or show that Stewart had any knowledge of any default by Ayer on his obligation to General Dynamics at the time he purchased these airplanes.” Taken out of context, the sentence could be read as an allocation of the burden of proof, and such an allocation would be improper. But the sentence can just as easily be read as a description of the evidence.
 
 [12]
 
 The sentence is at most ambiguous, and there is no other indication anywhere in the opinion that the bankruptcy judge misapplied the burden of proof. Consequently, we conclude that the bankruptcy judge placed the burden where it belonged — on Gary.
 

 Second, General Dynamics contends that, even if the bankruptcy judge acted properly in his assignment of the burden of proof, the holding must be reversed because the bankruptcy court considered Stewart’s knowledge on December 22, 1971 and January 4, 1972, the dates of purchase, rather than on August 3, 1972, the date of recordation. The district court found some merit in General Dynamics’s argument that Stewart’s knowledge was to be evaluated as. of August 3 but declined to choose between the dates of purchase and the date of recor-dation, holding that use of the date of purchase would be harmless error because Stewart did not know of the default by Ayer even on August 3. General Dynamics argues to us that the district court’s disposition of this issue was improper because August 3 was the relevant time, but the bankruptcy court had made no finding on the state of Stewart’s knowledge in August. We disagree with General Dynamics on both grounds.
 

 We conclude that the dates of purchase were the relevant dates. The rule of § 9.307(a) is designed to protect the innocent buyer against prior security interests in retail goods because he cannot be expected to discover those interests, while the secured party may generally be assumed to have authorized the sale of inventory by a retailer.
 
 See generally, e.g.,
 
 J. White & R. Summers, Uniform Commercial Code § 25-14 at 1070 (2d ed. 1980). But this “protection” leaves the buyer vulnerable if he cannot be certain of it until he records. Were that the rule, a buyer who discovered a violated security agreement after purchas
 
 *374
 
 ing but before recording could have given consideration, in good faith and without knowledge, and taken possession of the goods but he would take a position subordinate to that of the secured lender. Measuring knowledge at the time of sale or earlier, however, prevents any gap in protection, for a potential buyer who discovers a violated security interest at the time of purchase can always decide not to buy.
 
 [13]
 

 In the alternative, we conclude that the bankruptcy judge did find that in August Stewart was without knowledge of any violation of the security agreement between Ayer and General Dynamics. His opinion stated that Stewart was unaware of the lien until after the time of purchase, “and
 
 even then
 
 the mortgage appeared to authorize Ayer to sell free of any lien .... Stewart became
 
 and remained
 
 a buyer in ordinary course of business.” Bankruptcy Court Op. at 6 (emphasis added).
 

 Third, General Dynamics challenges the correctness of the holding that Stewart bought in good faith and without knowledge that the sale to him was in violation of the rights of General Dynamics.
 
 [14]
 
 Our holding above was based on alternative grounds — that the dates of purchase are the dates on which Stewart’s knowledge is relevant and that the bankruptcy court found that Stewart acted in good faith and had no knowledge on the date of recordation. In
 
 *375
 
 keeping with that alternative holding, we will consider Stewart’s knowledge and good faith on both dates, although General Dynamics’s argument deals mainly with the date of recordation.
 

 The holding that Stewart had no knowledge that the sale violated the security agreement between Ayer and General Dynamics is not clearly erroneous. There is nothing in the record to show any knowledge on the dates of purchase, for the results of the title search did not arrive until January 5, 1972, the day after the second purchase. Once those results arrived, there is nothing to indicate that Stewart saw the security agreement before August 3, 1972, and, even if he did, that agreement appeared to authorize the sale. The record supports the conclusion that Stewart first learned of the default by Ayer from General Dynamics’s letter of May 28, 1976. We cannot re-evaluate Stewart’s credibility in denying knowledge; that was a question for the trial judge.
 
 [15]
 

 General Dynamics also contends that Stewart did not act in good faith, suggesting that he knowingly bought the planes for less than their value and that, though he was experienced in the sale of aircraft, did not undertake a title search before purchasing.
 
 [16]
 
 To show that Stewart purchased below market value, General Dynamics relies on the gain on the later sale of one of the planes and on the use of a higher value in the 1975 mortgage agreement between Gary and its bank. Stewart apparently made no profit on the sale of the group of planes, and, indeed, his profit on a sale four years down the line is but weak evidence that he originally paid less than fair value for the planes and even weaker evidence that he was aware that this was a bargain too good to be true. Similarly, the use of a higher value in a mortgage agreement consummated three years later is weak evidence of the 1972 market value.
 

 Stewart’s failure to undertake a title search presents a question only slightly more troublesome. The Texas courts have repeatedly stated that the test of good faith is not negligence or diligence and that it is immaterial that the buyer was aware of facts that would put a reasonably prudent person on inquiry. To lose his status as a
 
 *376
 
 buyer in the ordinary course, the buyer must have actual knowledge of facts or circumstances that amount to bad faith.
 
 See, e.g., First State Bank & Trust Co. v. George,
 
 Tex.Civ.App.—Corpus Christi 1974, 519 S.W.2d 198,
 
 writ ref’d n. r. e.; Riley v. First State Bank,
 
 Tex.Civ.App.—Amarillo 1971, 469 S.W.2d 812, 816;
 
 Richardson Co. v. First National Bank,
 
 Tex.Civ.App.—Tyler 1974, 504 S.W.2d 812, 816,
 
 writ ref’d n. r. e.; cf. Citizens Bridge v. Guerra,
 
 1953, 152 Tex. 361, 258 S.W.2d 64, 69 (decided under predecessor statute). Thus, although a reasonably prudent person with Stewart’s experience might have conducted a title search with the FAA before purchasing, Stewart’s failure to do so does not, without more, establish that he acted in bad faith.
 
 Accord, Northern Illinois Corp. v. Bishop Distributing Co.,
 
 W.D.Mich.1968, 284 F.Supp. 121, 125 (no duty to search FAA records before purchasing aircraft from dealer);
 
 Texas National Bank v. Aufderheide,
 
 E.D.Ark.1964, 235 F.Supp. 599, 604 (same);
 
 Cessna Finance Corp. v. Skyways Enterprises, Inc.,
 
 Ky.1979, 580 S.W.2d 491, 494 n.7;
 
 Suburban Trust & Savings Bank v. Campbell,
 
 Ct. Common Pleas 1969, 19 Ohio Misc. 74, 48 Ohio Ops.2d 250, 250 N.E.2d 118, 121 (same). Nor did Stewart have actual knowledge of any circumstances that would put him in bad faith. We decline to overrule the holding that Stewart acted in good faith.
 
 [17]
 

 IV.
 

 General Dynamics next argues that, even if Stewart qualifies as a buyer in the ordinary course of business, Gary cannot take good title for one of two reasons — first, the security interest was not created by Gary’s seller and, second, Gary gave no consideration for the planes. Neither argument has merit.
 

 The first argument is based on the limitation in section 9.307(a): a buyer in the ordinary course of business takes free of a security interest only if it was created by his seller.
 
 See, e.g., National Shawmut Bank v. Jones,
 
 1967, 108 N.H. 386, 236 A.2d 484. General Dynamics, noting that the security interest it asserts was not created by Stewart (Gary’s seller) but by Ayer, contends that Gary cannot be protected against that interest. This argument misses the mark, for Gary does not claim under section 9.307(a). On the contrary, its position is that Stewart took good title under section 9.307(a), and Gary, as Stewart’s transferee, took whatever title Stewart had, under section 2.403(a), the “shelter” provision. It is therefore of no consequence that Gary’s seller did not create the security interest. General Dynamics attempts to rebut this reasoning by relying on language in
 
 National Shawmut Bank
 
 stating that section 2-403 of the Uniform Commercial Code cannot provide an escape from the limitations of section 9-307. In
 
 National Shawmut Bank
 
 an individual sold a ear, subject to a security interest, to a dealer, who then sold it to a buyer in the ordinary course of business. Since the security inter
 
 *377
 
 est was not created by his seller, the last buyer in the chain could not take free and clear of the interest under section 9-307 of the UCC. Section 2.403(a) provides that a purchaser of goods acquires all title that his transferor had or had power to transfer, and that a seller with voidable title can transfer good title. If, under that provision, a retailer who bought subject to a security interest was one with voidable title and had the power to transfer good title, the “created by his seller” limitation of section 9.307(a) would be without any effect, so the
 
 National Shawmut Bank
 
 court held that section 2.403(a) does not provide an escape to section 9.307(a). That rule has been approved by the commentators, see J. White & R. Summers, Uniform Commercial Code § 25-15 (2d ed. 1980), and we do not question it. But the rule is that section 2.403(a) is not available to save one who buys when the seller’s title is subject to a security interest but who does not qualify under section 9.307(a). It certainly does not mean that section 2.403(a) is not available to subsequent transferees from a successful section 9.307(a) buyer, as General Dynamics urges.
 
 See
 
 Skilton,
 
 Buyer in the Ordinary Course of Business under Article 9 of the Uniform Commercial Code,
 
 1974 Wis.L.Rev. 1, 76 (viewing the point as “obvious”). If General Dynamics were correct, section 9.307(a) would be of scant benefit to the “protected” buyer in the ordinary course, for good title means little if one cannot transfer it. We hold that the lien of General Dynamics was extinguished upon the sale by Ayer to Stewart under section 9.307(a), and the subsequent sale to Gary could not resurrect it.
 

 Finally, General Dynamics contends that Gary cannot take good title under section 2.403(a) because it furnished no consideration, receiving the aircraft as a gift.
 
 [18]
 
 We disagree. Section 2.403(a) applies to a “purchaser” of goods, and section 1.201 defines a “purchaser” as one who takes by “sale, discount, negotiation, mortgage, pledge, lien, issue or reissue,
 
 gift
 
 or any other voluntary transaction”. §§ 1.201(32), (33) (emphasis added).
 
 [19]
 
 The language could not be clearer. When the draftsmen of the Code wished to require consideration, they used the terms “buyer”, “seller”, and “sale”, defined in sections 2.106(a) and 2.103(a)(1) to require consideration, instead of “purchaser”, “transferor”, and “purchase”.
 
 See, e.g.,
 
 §§ 2.313, 2.314, 2.315. We cannot imagine applying any rule other than that a donee takes the title that his donor had.
 
 [20]
 

 V.
 

 We hold that the FA A does not preempt the provisions of the Texas Business and Commerce Code relating to the priority of interests in aircraft. Therefore, Stewart, as a buyer in the ordinary course of business, took the aircraft free and clear of the lien of General Dynamics. And Gary, as the transferee of Stewart, also took free and clear of the lien. Consequently, Gary is entitled to the possession of the remaining airplane and the proceeds of the airplane that was sold. The case is AFFIRMED.
 

 [1]
 

 . There is some dispute as to whether the parties have stipulated that the sale was unauthorized. We will assume, for purposes of this appeal, that Ayer was in default and that the sale was unauthorized.
 

 [2]
 

 . In this respect, the Federal Aviation Act reenacted the Civil Aeronautics Act without substantial change. The legislative history makes clear, however, that the re-enactment is not to be taken as an endorsement of any judicial construction of the CAA.
 
 See
 
 H.R.Rep.No. 2360, 85th Cong., 2d Sess. (1958),
 
 reprinted in
 
 (1958] U.S.Code Cong. & Ad.News 3741, 3750.
 

 [3]
 

 . Given the large number of cases on this point — some three dozen as of 1973, see Sigman,
 
 The Wild Blue Yonder: Interests in Aircraft Under Our Federal System,
 
 46 S.Cal.L. Rev. 316, 317 n.6 (1973) — it would not be profitable to engage in lengthy examination of the facts of prior cases or in an evaluation of the reasons relied upon in each case reaching a result different from ours. Such exegesis is available elsewhere.
 
 See id.
 
 at 338-76; Annot., 22 A.L.R.3d 1270 (1968 & Supp.1981). It is, however, worth noting that the only recent federal case we have found that holds state priorities law preempted,
 
 Sun Bank v. Snell (In re Cone),
 
 Bkrtcy.M.D.Fla.1981, 11 B.R. 925, did not examine the legislative history but simply asserted that the FAA preempted priority rules. The single federal case it offered as authority was
 
 Danning v. Pacific Propeller, Inc. (In re Holiday Airlines Corp.),
 
 9 Cir. 1980, 620 F.2d 731,
 
 cert. denied,
 
 449 U.S. 900, 101 S.Ct. 269, 66 L.Ed.2d 130, which did state “The provisions of the Federal Aviation Act preempt state law insofar as they relate to the priority of liens."
 
 Id.
 
 at 733. But that statement simply repeats the truism that,
 
 to the extent
 
 that federal law deals with priorities, it preempts state law. Indeed, the
 
 Pacific Propeller
 
 court proceeded to apply state priority law after concluding that the FAA sought only to provide a central recording system,
 
 see id.
 
 at 733, 735-36. The Ninth Circuit has relied on
 
 Pacific Propeller
 
 as authority for the proposition that the FAA does not preempt state law on priorities,
 
 CIM International v. United States,
 
 9 Cir. 1980, 641 F.2d 671, 675 n.6, and has recently re-stated that proposition without seeing any need to explain
 
 Pacific Propeller, Danning v. World Airways, Inc. (In re Holiday Airlines),
 
 9 Cir. 1981, 647 F.2d 977,
 
 cert. denied,
 
 1982, -U.S. -, 102 S.Ct. 1009, 71 L.Ed.2d 299. Consequently, we think that
 
 Sun Bank
 
 is without foundation.
 

 [4]
 

 . In this case, we would not have to
 
 invalidate
 
 state law, for chapter 9 of the Texas Business and Commerce Code, which is the applicable state law, does not apply “to a security interest subject to any statute of the United States ... to the extent that such statute governs the rights of parties to and third parties affected by transactions in particular types of property”. Tex.Bus. & Com.Code Ann. § 9.104(1) (Vernon Supp.1982). Thus, if we hold that Congress intended to govern the rights of third parties, the Texas statute by its own terms does not apply, and we need not invalidate it. Nonethe
 
 *370
 
 less, to determine whether chapter 9 applies, we must engage in the analysis ordinarily applied to questions of preemption.
 

 [5]
 

 . The early leading case holding that the CAA preempted state law did not undertake an examination of legislative intent.
 
 In re Veterans’ Air Express Co.,
 
 D.N.J.1948, 76 F.Supp. 684. Instead, the court established a proposition now indubitably true — that Congress had the power, under the commerce clause, to regulate the aircraft in question, even though they were not at that time mobile in interstate commerce. Then, the
 
 Veterans’
 
 court apparently assumed that Congress had exercised that power to displace state law. (The holder of the mortgage interest in the case was the federal government, and, in the words of one court, the
 
 Veterans'
 
 analysis is “beclouded by allusions to priority of government-owned liens”.
 
 Southern Jersey Airways, Inc. v. National Bank,
 
 1970, 108 N.J.Super. 369, 261 A.2d 399.) The failure to analyze the key question of congressional intent diminishes the value of the
 
 Veterans’
 
 decision, just as it diminishes the value of
 
 Dawson v. Gen. Discount Corp.,
 
 1950, 82 Ga.App. 29, 60 S.E.2d 653, and thus undermines later cases that rely on these opinions. Similarly, the foremost recent cases holding that the FAA preempts state law fail to cite anything in the legislative history or even to point to statutory language that supports the asserted intention of Congress to protect recorded interests against all other interests.
 
 See Sun Bank v. Snell (In re Cone),
 
 M.D.Fla.1981, 11 Bankr. 925;
 
 Dowell v. Beech Acceptance Corp.,
 
 1970, 3 Cal.3d 544, 476 P.2d 401, 91 Cal.Rptr. 1 (in bank),
 
 cert. denied,
 
 1971, 404 U.S. 823, 92 S.Ct. 45, 30 L.Ed.2d 50;
 
 O’Neill v. Barnett Bank,
 
 Fla.App. 1978, 360 So.2d 150.
 

 [6]
 

 . In
 
 Bank of Lexington v. Jack Adams Aircraft Sales, Inc.,
 
 5 Cir.1978, 570 F.2d 1220, 1225, this court suggested that the FAA did not necessarily occupy the field as General Dynamics’s argument would suggest. There the court stated, “The [Federal Aviation] Act preempts
 
 only
 
 that portion of state law which
 
 confticts
 
 with its provisions.” (emphasis added).
 

 [7]
 

 . In fact, the provisions of section 503 never state that recorded interests will take priority over interests recorded subsequently. Instead, section 503 makes
 
 every
 
 recorded interest “valid” against
 
 all
 
 persons; if “valid” means “enforceable”, section 503 makes all recorded interests enforceable against all other recorded interests — a logical impossibility for a priority system. Only by assuming the conclusion can one make section 503 a system according priority to recorded interests in order of time of filing.
 

 [8]
 

 . Similarly, section 503(c) of the Act, 49 U.S.C. 1403(c), states that, until recordation, an instrument shall not be valid except as to the parties and their successors and persons with actual knowledge. That provision could be read as providing a priority rule for persons with actual knowledge. It could, however, also be read as treating the instrument as recorded as to the party with actual knowledge and leaving the question of the effect of that constructive recordation to state law.
 

 [9]
 

 . A later Congress, explaining the need for section 506, indicated that it viewed the statute as creating only a recording system and compared it to the Federal Motor Vehicle Lien Act, Pub.L. No.85-728 (repealed 1978), which dealt with security interests in certain large buses and trucks by making enforceable in all states a security interest validated in one state. H.R. Rep.No.1033, 88th Cong., 1st Sess. 2-3 (1963). Under the FMVLA, as one commentator put it,
 

 It is too clear for argument that the law applicable to security transactions which may be perfected under 49 U.S.C. § 313 is the law of some state and is not federal law.... It is improbable that 49 U.S.C. § 313 will ever pose any difficult problems in litigation. It is certain that it provides not even a handhold for argument that the law of motor vehicle liens has become federal law.
 

 1 G. Gilmore, Security Interests in Personal Property § 13.7 (1965). Of course, the view of a later Congress does not establish the intent of the enacting Congress. Nonetheless, it does help to confirm our conclusion as would opinions of other courts examining legislative intent.
 

 [10]
 

 . We also reject the view that Congress created a federal filing system and left priorities to federal common law. One major reason for creating a single filing system was to foster certainty in aircraft financing transactions. It hardly seems likely that Congress would have sought certainty in recording but left priorities to the slow and uncertain process of judicial development.
 

 [11]
 

 . Even if the bankruptcy court had misapplied the burden of proof, that fact alone would not necessarily compel reversal. This court has held in a recent bankruptcy case that the allocation of the burden of proof is of concern primarily in a trial before a jury.
 
 Katz v. Weil (In re Garfinkle),
 
 5 Cir. 1978, 577 F.2d 906, 910 (alternative holding).
 

 [12]
 

 .
 
 See Katz v. Weil (In re Garfinkle),
 
 5 Cir. 1978, 577 F.2d 906. There, this court considered the following sentence from a bankruptcy judge’s opinion: “The Court concludes that Curtis Katz has failed to prove by a preponderance of the evidence that he was vested with a valid beneficial ownership interest in the Eden Roc Hotel.” In the .context of the sentence immediately following — “On the contrary, the Court concludes that the preponderance of the evidence establishes that Curtis Katz ... failed to take ... action to cut off the redemptive rights of Barbara Garfinkle to protect her ownership interest in the Eden Roc Hotel.” — the court viewed the first sentence as a description of the evidence rather than as an allocation of the burden of proof.
 

 [13]
 

 . We find additional support for our conclusion that the dates of purchase are the relevant dates in the limited nature of the current controversy over when the protection of the buyer in the ordinary course attaches. Although there is some debate as to whether one who qualifies as a buyer in the ordinary course prevails over the secured lender if the lender attempts to foreclose before the buyer takes possession of the goods, no one seems to question that, from the time of delivery, the buyer prevails.
 
 See
 
 T. Quinn, UCC Commentary and Law Digest ¶ 3-307[A][8] (1978); Note,
 
 When Does a Buyer Become a Buyer in Ordinary Course? UCC §§ 1-201(9), 9-307(1): A Test and a Proposal,
 
 60 Neb.L.Rev. 848, 875 (1981);
 
 compare, e.g., Jones v. One Fifty Foot Gulfstar Motor Sailing Yacht,
 
 5 Cir. 1980, 625 F.2d 44, 47 n.4 (dictum) (the date of contract marks the beginning of protection, at least where the buyer has made partial payment)
 
 with Martin Marietta Corp. v. New Jersey Nat’l Bank,
 
 3 Cir. 1979, 612 F.2d 745, 749 (assuming, without deciding, that the date of identification of the goods to the contract marks the beginning of protection)
 
 and with Chrysler Corp. v. Adamatic, Inc.,
 
 1973, 59 Wis.2d 219, 208 N.W.2d 97, 106-07 (the passage of title marks the beginning of protection). Although one might argue that the buyer’s qualification should be determined as of a date earlier than that on which the protection takes effect, surely the qualification should not be determined as of a
 
 later
 
 date.
 

 General Dynamics cites no authority for its view that knowledge must be determined as of the date of recordation. It seems to rely entirely on 49 U.S.C. § 1403(c), which provides that no conveyance shall be valid as against third parties until recorded. Thus, according to General Dynamics, it could not lose its rights by operation of section 9.307(a) until Stewart recorded the conveyance, and Stewart would have to be without knowledge at the moment when General Dynamics would lose its rights if he is to take under section 9.307(a). To the extent that this argument reiterates the preemption argument, we have rejected it in Part II. The validity of General Dynamics’s interest' is governed- by state law, which as our discussion in text shows, subordinates General Dynamics to a buyer in the ordinary course as of the date of purchase. Of course section 1403(c) does not affirmatively grant interests to third parties simply on the basis of the failure of the parties to the conveyance to record, and General Dynamics has no other claim arising after the failure to record; it did not in any way deal in reliance on recorded title.
 
 See Peters v. Norris,
 
 Tex.Civ.App.—Houston 1966, 402 S.W.2d 216, 219-20.
 

 [14]
 

 . In its brief, General Dynamics urged that we hold these conclusions “clearly erroneous”. At oral argument, though, it changed its position, now contending that the determination of buyer in the ordinary course status is a mixed question of law and fact, which would give us greater freedom to substitute our judgment for that of the trial judge. In support of its new position, it cites
 
 Associates Discount Corp. v. Rattan Chevrolet, Inc.,
 
 Tex.1970, 462 S.W.2d 546. That case held that summary judgment was improper when supported only by conclu-sory assertions that the sale was in the ordinary course of business because whether a
 
 sale
 
 is in the ordinary course of business is a mixed question of law and fact. The case did not hold, and we likewise refuse to hold, that the question of the buyer’s knowledge is a mixed question. Some aspects of buyer in the ordinary course status may be mixed questions, as is the case with the question of good faith, reviewed below.
 
 See id.;
 
 Skilton,
 
 Buyer in the Ordinary Course of Business under Article 9 of the Uniform Commercial Code,
 
 1974 Wis.L. Rev. 1, 31.
 

 [15]
 

 . General Dynamics has referred us to a number of facts that it argues establish that Stewart did not act in good faith and without knowledge. Most of the facts relate to the question of good faith and will be discussed below.
 
 See
 
 note 17. None of them tend to establish that Stewart had knowledge on the dates of purchase or on the date of recordation. Only one of the facts requires any discussion at this point. General Dynamics asserts that “shortly after receiving notice of the liens in January 1972” Stewart learned of a lawsuit between Ayer and General Dynamics. The record is unclear as to how soon after January Stewart learned of the lawsuit. Even if it was before August 3, knowledge of the lawsuit still does not tend to show that Stewart knew that the sale to him violated the security agreement. The remaining facts relied upon by General Dynamics are simply irrelevant to Stewart’s knowledge.
 

 [16]
 

 . General Dynamics also notes a number of other facts that it views as evidence of Stewart’s bad faith: (1) Stewart purchased the planes in his individual capacity, (2) he waited seven months to record his title, (3) he gave two planes to Gary and sold another one to Gary at a large gain, (4) in August 1976, Stewart and Gary obtained an indemnification agreement from Ayer, and (5) Gary’s files contained a rough draft of a letter, never sent, that misrepresented the date on which Gary learned of the lien. The first three facts are obviously completely irrelevant to the question of Stewart’s good faith. The indemnification agreement, obtained some four and a half years after the purchase, shows little about Stewart’s good faith on that date or on the date of recordation; if anything, it tends to establish that he acted in good faith because he saw no need for such an agreement at those times. Finally, we are unmoved by General Dynamics’s arguments that the rough draft of the letter establishes bad faith. First, the letter was clearly labelled a draft and was never sent, so, at most, it could establish that Stewart thought about acting in bad faith and decided not to do so. Second, the letter was drafted in 1976, long after Stewart’s good or bad faith ceased to be relevant. Third, examination of the letter indicates that the author was uncertain of the date of the discovery of the liens, placed it shortly after Gary’s sale of one of the planes and only later filled in that date, suggesting that there was no purposeful misrepresentation of the date of the discovery. Finally, the record does not establish that Stewart drafted the letter, and he denied having done so.
 

 [17]
 

 . General Dynamics contends that the bankruptcy court and the district court failed to recognize the cases upon which it relies in its argument that Stewart acted in bad faith. We have considered those cases, and our conclusion is unchanged. The only Texas case cited,
 
 International Harvester Co. v. Glendenning,
 
 Tex.Civ.App.—Dallas 1974, 505 S.W.2d 320, is easily distinguishable. The buyer in that case acquiesced in the falsification of the sale documents to show that he had traded in used tractors in his purchase of a new one, when in fact he had not, and he repeated the misrepresentation to his seller’s creditor. There was no such dishonesty here. The cases from other jurisdictions are similarly distinguishable. In
 
 Taylor Motor Rental, Inc. v. Associates Discount Corp.,
 
 1961, 196 Pa.Super. 182, 173 A.2d 688, the party seeking to qualify as a buyer in the ordinary course was merely an alter-ego of the seller, and the transaction had been undertaken in an attempt to avoid the creditor’s security interest. The opinion in
 
 Rex Financial Corp.
 
 v.
 
 Marshall,
 
 N.D.Ark.1976, 406 F.Supp. 567, is not clear, but apparently the buyer was informed of the secured creditor’s interest before the purchase,
 
 id.
 
 at 573, and the court held that Arkansas law, unlike Texas law, provided for constructive notice,
 
 id.
 
 at 577. Finally, in
 
 Cosid, Inc. v. Bay Steel Products Co.,
 
 Fla.App. 1971, 252 So.2d 274, the court merely overturned summary judgment for the buyer where he was aware of suspicious circumstances, remanding to allow the fact-finder to determine whether the buyer acted in good faith.
 

 [18]
 

 . It is not clear how this argument would help General Dynamics if we accepted it. As we have already established, the sale to Stewart extinguished General Dynamics’s lien. Even if Gary took less than good title from Stewart, we do not see how that would resurrect an extinguished lien; it would mean that
 
 Stewart
 
 retained some interest.
 

 [19]
 

 . Although chapter 2 is entitled “Sales”, § 2.101, it expressly regulates purchasers in section 2.403, and adopts the general definition of “purchaser” from chapter 1,
 
 see
 
 § 2.103(d). Furthermore, under section 2.102, the scope of chapter 2 is defined as “transactions in goods”, with no requirement of consideration.
 
 See generally
 
 J. White & R. Summers, Uniform Commercial Code § 1-1 at 22 (2d ed. 1980) (differentiating between “transactions in goods” and “sales”); T. Quinn, Uniform Commercial Code Commentary and Law Digest ¶ 2.102[A] (1978).
 

 [20]
 

 . The cases cited by General Dynamics as requiring a “sale” to invoke the coverage of chapter 2 deal with the warranty provisions of the Code.
 
 Allen v. Ortho Pharmaceutical Corp.,
 
 S.D.Tex.1974, 387 F.Supp. 364;
 
 Harvey v. Sears, Roebuck and Co.,
 
 Del.Super. 1973, 315 A.2d 599. Since those provisions expressly require a sale, the cases are not instructive on the need for consideration under section 2.403, which does not require a sale.